EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hon. Manuel Díaz Saldaña, En su capacidad como Contralor Del Estado Libre Asociado de Puerto Rico<br><br>Peticionario<br><br>vs.<br><br>Hon. Aníbal Acevedo Vilá, en Su capacidad como Gobernador del Estado Libre Asociado de Puerto Rico; y Hon. Juan Carlos Méndez, en su Capacidad como Secretario de Hacienda<br><br>Recurridos | Mandamus<br><br>2006 TSPR 108<br><br>168 DPR _____ |

Número del Caso: MD-2006-2

Fecha: 30 de junio de 2006

Oficina del Procurador General:

       Lcdo. Salvador J. Antonetti Sttutts
       Procurador General

Abogado de la Parte Peticionaria:

       Lcdo. José Julián Álvarez González
       Lcda. Nilsa Añeses Loperana
       Lcdo. Ruperto J. Robles

Materia: Mandamus

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Manuel Díaz Saldaña,
en su capacidad como Contralor
del Estado Libre Asociado de
Puerto Rico
     Peticionario

        vs.

                    MD-2006-02      Mandamus

Hon. Aníbal Acevedo Vilá, en
su capacidad como Gobernador
del Estado Libre Asociado de
Puerto Rico; y
Hon. Juan Carlos Méndez, en su
capacidad como Secretario de
Hacienda
     Recurridos

SENTENCIA

San Juan, Puerto Rico, a 30 de junio de 2006.

El pasado 28 de abril de 2006, el Contralor del Estado Libre Asociado de Puerto Rico, Hon. Manuel Díaz Saldaña, presentó ante nosotros una petición de *mandamus* en jurisdicción original. Nos solicita que ordenemos al Gobernador del Estado Libre Asociado, Hon. Aníbal Acevedo Vilá, a dejar sin efecto su instrucción al Secretario de Hacienda, Hon. Juan Carlos Méndez Torres, de autorizar únicamente el desembolso del setenta y cinco por ciento (75%) de los gastos de nómina y demás gastos operacionales de la

Oficina del Contralor, proyectados para los meses de mayo y junio del año en curso.

En vista de los acontecimientos suscitados entre las Ramas Ejecutiva y Legislativa después del inicio de este caso, de la legislación aprobada recientemente para conjurar los problemas fiscales que atraviesa el Gobierno del Estado Libre Asociado de Puerto Rico, y dado que el recurso de *mandamus* es uno discrecional, altamente privilegiado, denegamos el auto solicitado.

I

El 26 de abril de 2006, el Gobernador emitió su Orden Ejecutiva Núm. 10, Boletín Administrativo OE-2006-10 (en adelante, la Orden Ejecutiva). Expuso en ésta que, a pesar de los esfuerzos realizados por la Rama Ejecutiva, los fondos estimados disponibles para cerrar el año fiscal 2005-2006 resultarían insuficientes para cubrir las operaciones del gobierno para dicho período, según había informado el Secretario de Hacienda. Añadió que, de continuar efectuándose de manera corriente los desembolsos correspondientes a todas las entidades que se nutrían del Fondo General, el cierre total del gobierno antes de que culminara el año fiscal sería inminente. En vista de ello, expresó que era indispensable mantener un nivel mínimo de funcionamiento gubernamental que incluyera la operación de los elementos esenciales de las agencias de seguridad y salud pública, de manera que se

pudiera preservar la razón de estado, la salud y la seguridad del pueblo.

Conforme a lo anterior, el Gobernador instruyó al Secretario de Hacienda a autorizar los desembolsos con cargo al Fondo General de acuerdo a determinadas directrices incorporadas en la referida Orden Ejecutiva. Entre éstas, ordenó que sólo se desembolsara a favor de la Oficina del Contralor de Puerto Rico el setenta y cinco por ciento (75%) de los gastos de nómina proyectados para los meses de mayo y junio de 2006. Además, dispuso que la Oficina del Contralor recibiría los desembolsos correspondientes a los demás gastos operacionales en proporción a lo asignado para cubrir su nómina.

Según los términos establecidos en el séptimo POR TANTO de la citada Orden Ejecutiva, ésta tendría vigencia desde el 1ro de mayo de 2006 hasta el 30 de junio de 2006, "salvo que se disponga por ley para el ingreso de fondos adicionales que sean suficientes para cumplir con todas las obligaciones del presente año fiscal". Orden Ejecutiva Núm. 10, *supra*, pág. 4.

Así las cosas, el Contralor presentó ante nos el recurso del epígrafe contra el Hon. Aníbal Acevedo Vilá como Gobernador de Puerto Rico y contra el Hon. Juan Carlos Méndez Torres en su capacidad oficial como Secretario de Hacienda (en adelante, los demandados). Adujó, esencialmente, que el Gobernador no tenía la

facultad constitucional ni legal para reducir el presupuesto de la Oficina del Contralor, en vista de que ésta operaba por mandato constitucional de forma independiente a la Rama Ejecutiva. Solicitó, por tanto, que se le ordenara al mandatario dejar sin efecto aquella parte de la Orden Ejecutiva que instruía el desembolso exclusivo del setenta y cinco por ciento de los gastos de nómina y demás gastos operacionales de la Oficina del Contralor, proyectados para los últimos meses del año fiscal 2005-2006. Igualmente, reclamó que se le ordenara al Secretario de Hacienda a certificar como disponible el presupuesto asignado originalmente a dicha oficina.

El Contralor acompañó su petición con una "Solicitud de Orden Provisional en Auxilio de Jurisdicción". Argumentó que tenía altas probabilidades de prevalecer en los méritos del caso, y que no había otro remedio en ley para evitar la violación constitucional del Gobernador, la cual causaría un daño irreparable. A tenor con lo alegado, solicitó la expedición de una orden interlocutoria prohibiendo a los demandados poner en vigor la Orden Ejecutiva, en lo que a la Oficina del Contralor respecta.

Posteriormente, los demandados comparecieron a oponerse a la solicitud de orden provisional en auxilio de jurisdicción y solicitaron la desestimación de la petición de *mandamus* presentada por el Contralor. En síntesis, adujeron que el caso presentaba una

controversia prematura debido a que el proceso político estaba operando en búsqueda de soluciones a la crisis gubernamental, siendo ésta además una cuestión política que no era susceptible de ser resuelta por los tribunales. Asimismo, sostuvieron que el Contralor no tenía capacidad legal ni legitimación activa para instar el recurso, toda vez que la Ley Orgánica de la Oficina del Contralor no se la concedía y su alegado daño era uno generalizado.

Analizados los escritos presentados hasta el momento, el 2 de mayo de 2006, concedimos al Contralor un término para que se expresara en torno a los argumentos de los demandados. Éste así lo hizo. En su réplica expuso que la controversia estaba madura debido a que los efectos de la Orden Ejecutiva ya se estaban experimentando en la Oficina del Contralor; que el caso no presentaba los elementos requeridos para catalogar la controversia como una cuestión política, y que el Contralor posee tanto legitimación activa como capacidad jurídica para instar el pleito.

Posteriormente, el Contralor reiteró su solicitud de orden provisional en auxilio de jurisdicción. Los demandados nuevamente se opusieron.

Mientras se llevaba a cabo este trámite judicial, el 8 de mayo de 2006, el Hon. Aníbal Acevedo Vilá y los Presidentes de las cámaras legislativas, Hon. Kenneth McClintock Hernández y Hon. José Aponte Hernández,

designaron conjuntamente una Comisión Especial como parte de la búsqueda de soluciones a los problemas fiscales y presupuestarios del Gobierno de Puerto Rico. Dicha Comisión rindió un informe con sus recomendaciones el 10 de mayo del presente año. *Véase* Informe de la Comisión Especial designada por el Gobernador, Presidentes de Senado y Cámara de Representantes de 10 de mayo de 2006. Posteriormente, tanto la Cámara de Representantes como el Senado aprobaron diversas medidas legislativas para atender la situación económica del gobierno, las cuales fueron firmadas por el Gobernador.[1]

Con mayor pertinencia al caso de autos, el 13 de mayo de 2006, se aprobó la Ley Núm. 90 conocida como la Ley para el Financiamiento del Déficit Gubernamental del 2006. En su artículo 2, la Asamblea Legislativa dispuso:

> Se autoriza al Banco Gubernamental de Fomento a otorgar un préstamo al Departamento de Hacienda por la cantidad máxima de $741,000,000.00 para el pago de nómina, los gastos operacionales del gobierno central y aliviar el flujo de caja de dicho departamento como parte del déficit gubernamental correspondiente al

---

[1] *Véanse, por ejemplo,* Ley para el Financiamiento del Déficit Gubernamental del 2006, Ley Núm. 90 de 13 de mayo de 2006; Ley del Fondo de Interés Apremiante, Ley Núm. 91 de 13 de mayo de 2006; Ley para la Imposición de Contribución Extraordinaria de 2006, Ley Núm. 98 de 16 de mayo de 2006; Ley para la Reforma Fiscal de 2006, Ley Núm. 103 de 25 de mayo de 2006; Enmiendas a la Ley de Bonos del Gobierno, Ley Núm. 104 de 25 de mayo de 2006; Enmiendas a la Ley de la Oficina de Gerencia y Presupuesto, Ley Núm. 106 de 25 de mayo de 2006; Ley de Control de Gastos en la Nómina Gubernamental para la Reforma Fiscal del 2006, Ley Núm. 111 de 31 de mayo de 2006; Resolución Conjunta Núm. 119 de 13 de mayo de 2006 (R.C. de la C. 1485).

año fiscal 2005-2006, según recomendado por el Informe emitido por la Comisión Especial Designada por el Gobernador, Presidentes del Senado y la Cámara de Representantes, emitido con fecha de 10 de mayo de 2006.

Igualmente, se autorizó al Secretario de Hacienda a efectuar desembolsos con cargo a dicho financiamiento para los gastos allí indicados, los cuales incluyen el gasto de nómina y los gastos operacionales del gobierno central. Art. 3 de la Ley Núm. 90.

Con el mismo propósito, además, se aprobó la Resolución Conjunta Núm. 119 de 13 de mayo de 2006 mediante la cual se facultó al Secretario de Hacienda a desembolsar a las entidades gubernamentales afectadas por la Orden Ejecutiva los fondos generados por la Resolución Conjunta Núm. 118 de 2 de mayo de 2006, entre otros fondos, para que todos los empleados públicos regresaran a su taller de trabajo. Asimismo, dichas cantidades iban dirigidas a garantizarle a estos empleados el pago de una compensación equivalente a su salario correspondiente a la quincena de trabajo iniciada el 1ro de mayo de 2006.

Como resultado de estas medidas legislativas, el Banco Gubernamental de Fomento aprobó el aludido préstamo y el gobierno recibió los fondos necesarios para continuar operando durante el año fiscal 2005-2006. Conforme a ello, la Orden Ejecutiva quedó sin efecto por sus propios términos, según surgía de su séptimo POR TANTO. Así lo informó el Secretario de la Gobernación, Hon. Aníbal José Torres, a través de la Carta Circular de

15 de mayo de 2006. Del mismo modo, mediante Carta Circular Núm. 1300-27-06 de 16 de mayo de 2006, el Secretario de Hacienda dejó sin efecto sus cartas Circulares Núm. 1300-25-06 y 1300-26-06 en las cuales había impartido instrucciones sobre los procesos a seguir para el desembolso de los fondos durante los últimos dos meses del año fiscal 2005-2006, de conformidad con la Orden Ejecutiva.

En vista de estos hechos, expongamos el derecho aplicable.

## II

El *mandamus* es uno de los recursos que puede expedir este Tribunal como parte de su jurisdicción original. Const. E.L.A., Art. V, Sec. 5, 1 L.P.R.A.; Ley de la Judicatura de 2003, Art. 3.002(a), 4 L.P.R.A. sec. 24s(a); Art. 650 del Código de Enjuiciamiento Civil (1933), 32 L.P.R.A. sec. 3422. El recurso de *mandamus* es un auto discrecional y altamente privilegiado mediante el cual se ordena a una persona o personas naturales el cumplimiento de un acto que en dicho auto se exprese y que esté dentro de sus atribuciones o deberes. Art. 649 del Código de Enjuiciamiento Civil (1933), 32 L.P.R.A. sec. 3421; *Baez Galib y otros v. C.E.E.*, 152 D.P.R. 382 (2000).

La expedición del auto de *mandamus* requiere que el demandado o demandados ya cuenten con la facultad en ley para ejecutar el acto ordenado por el tribunal, toda vez

que este recurso no confiere una nueva autoridad. Art. 649 del Código de Enjuiciamiento Civil, *supra.* Sin embargo, el acto que se intenta compeler mediante este recurso debe surgir de la ley como un deber ministerial, que no admita discreción en su ejercicio por parte del demandando. *Noriega v. Hernández Colón,* 135 D.P.R. 406 (1994). Ello significa que la ley debe prescribir y definir dicho acto con tal precisión y certeza que nada deja al ejercicio de juicio o criterio alguno. D. Rivé Rivera, *Recursos Extraordinarios*, 2da ed., San Juan, Ed. U.I.A., 1996, pág. 107.

No obstante, hemos aclarado que este deber no necesariamente tiene que surgir expresamente de un estatuto, pues le corresponde a los tribunales interpretar la ley para determinar la presencia o ausencia del acto ministerial. *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982). Luego de la referida evaluación estatutaria, los tribunales pueden determinar si se intenta "compeler la ejecución de actos ilegales, contrarios a la política pública o tendentes a auxiliar un propósito ilegal", en cuyo caso no procede el recurso de *mandamus*. *Noriega v. Hernández Colón, supra*, a la pág. 456.

En nuestra jurisdicción, además, se ha establecido firmemente que un auto de *mandamus* puede ser expedido contra el Gobernador del Estado Libre Asociado de Puerto Rico. *Véase*, D. Rivé Rivera, *El Mandamus en Puerto Rico*,

46 Rev. C. Abo. P.R. 15, 27-28 (1985). Así lo reconocimos desde que se introdujo este recurso a nuestro ordenamiento legal, al resolver que el Gobernador:

> ...está sujeto al auto de Mandamus lo mismo que cualquier otro funcionario del departamento ejecutivo. Nuestro gobierno es un gobierno de ley y todos los funcionarios, desde el más alto hasta el más inferior están obligados a obedecer la ley sin duda alguna. *Lutz v. Post, Gobernador*, 14 D.P.R. 860, 869-870 (1908).

Ahora bien, la expedición del recurso que discutimos requiere el previo análisis de los siguientes factores: 1) el posible impacto que éste pueda tener sobre los intereses públicos que puedan estar involucrados; 2) evitar intromisiones indebidas con los procedimientos del Poder Ejecutivo, y 3) que el acto no se preste a confusión o perjuicio de los derechos de terceras personas. *Noriega v. Hernández Colón, supra.*

Al momento de determinar si se expide o no el auto, cobra particular importancia el posible impacto que pudiera tener su expedición sobre los intereses públicos. *Baez Galib y otros v. C.E.E., supra.* "De ordinario, el posible impacto público que tendrá la expedición del *mandamus* será proporcional a la importancia del deber ministerial que se alega ha sido incumplido y que se pretende vindicar mediante el *mandamus*." *Id.*, a la pág. 392. En este sentido, el criterio que gobierna la expedición de este recurso se parece al que impera en los *injunctions*, en donde reviste gran importancia el posible

impacto al interés público. D. Rivé Rivera, *op cit.*, a las págs. 113-114; *A.P.P.R. v. Tribunal Superior*, 103 D.P.R. 903 (1975).

Es menester señalar que, desde los inicios de este recurso extraordinario en nuestro sistema judicial, hemos interpretado como un acto excepcional el que este Tribunal, en jurisdicción original, expida un auto de *mandamus. Véanse Palmer v. Guerra*, 9 D.P.R. 555 (1905); *Negrón et al. v. El Superintendente de Elecciones*, 11 D.P.R. 366 (1906); *Partido Popular v. Gallardo*, 56 D.P.R. 706 (1940); *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264 (1960); *P.A.C. v. Gobernador*, 85 D.P.R. 156 (1964); *Vocero de Puerto Rico v. Hernández Agosto*, 130 D.P.R. 501 (1992). Así, en el pasado, hemos indicado que el ejercicio de nuestra jurisdicción original dependerá de que la solicitud de *mandamus* vaya dirigida contra un principal funcionario del gobierno, que levante cuestiones de gran interés público, y que se requiera de un pronto y urgente despacho del asunto que no puede ser conseguido a través de los tribunales de instancia. *Id.*

Por último, debemos hacer hincapié en que el auto de *mandamus*, por tratarse de un recurso altamente privilegiado, debe ser expedido luego de una serena y ponderada evaluación de las circunstancias e intereses presentes en la controversia. Así lo hemos reconocido anteriormente, al expresar:

> Para que deba expedirse un auto de mandamus, sin embargo, no es suficiente que el

peticionario tenga un derecho claro a lo que solicita y que el demandado tenga la obligación correspondiente de permitir el ejercicio de ese derecho. Se trata de un auto 'altamente privilegiado', según expresa la ley de su creación, 32 LPRA sec. 3421, y los tribunales tienen necesariamente que medir todas las circunstancias concurrentes, tanto al determinar si debe o no expedirse el auto como al fijar el contenido de la orden, una vez resuelta en la afirmativa la cuestión inicial. En otras palabras, el remedio no se concede *ex debito justitiae* y tan pronto se reconoce el derecho del peticionario, **sino únicamente cuando el tribunal esté convencido de que se cumplirán propósitos de utilidad social e individual**. Para esos fines, es indispensable estimar qué efectos tendrá la orden en el adecuado cumplimiento de las responsabilidades del funcionario afectado por ella y hasta qué punto habrá de beneficiar al solicitante. **Procede, en síntesis, establecer el más fino equilibrio posible entre los diversos intereses en conflicto**. (Énfasis nuestro y citas omitidas.) *Dávila v. Superintendente de Elecciones*, *supra*, a las págs. 283-284.

Conforme al trasfondo jurídico esbozado, nos toca determinar si en este caso procede la expedición del auto de *mandamus*.

IV

El Contralor del Estado Libre Asociado de Puerto Rico nos solicita que expidamos un auto de *mandamus* dirigido al Gobernador, en consideración a que éste ordenó que se desembolsara únicamente el setenta y cinco por ciento (75%) de los gastos de nómina y demás gastos operacionales de la Oficina del Contralor, proyectados para mayo y junio de 2006. Nos solicita que le ordenemos

al Primer Ejecutivo dejar sin efecto dicha directriz, toda vez que no posee la facultad legal ni constitucional para obrar de esa manera.

Al atender este planteamiento, tomamos conocimiento judicial de que al ser aprobada la Ley para el Financiamiento del Déficit Gubernamental del 2006, *supra*, y la Resolución Conjunta Núm. 119 de 13 de mayo de 2006, entre otras piezas legislativas, cesaron aquellas razones aducidas por el Gobernador en su Orden Ejecutiva para ordenar el desembolso limitado de los gastos de la Oficina del Contralor. Igualmente, tomamos conocimiento judicial de que, a partir de la aprobación de estas medidas, el Gobierno del Estado Libre Asociado de Puerto Rico recibió los fondos necesarios para continuar sus operaciones en la última etapa del año fiscal 2005–2006. Siendo así, la directriz contenida en la Orden Ejecutiva, cuya reversión solicita el Contralor en este caso, perdió su eficacia por sus propios términos. Es decir, el Contralor ya obtuvo el remedio que nos solicitó. El Gobernador ya ejecutó el acto que el Contralor le pretendía obligar mediante una orden de este Tribunal.

En atención a este cuadro fáctico, procede denegar el auto de *mandamus* solicitado. El auto de *mandamus* no debe expedirse para resolver una controversia que, como la de autos, ya ha sido resuelta por las Ramas Ejecutiva y Legislativa. El carácter altamente privilegiado de este recurso requiere que su expedición tenga lugar solamente

en circunstancias extraordinarias, cuando el balance de los intereses envueltos amerite la intervención del foro judicial.

Conforme a lo expresado, denegamos el auto de *mandamus* solicitado por el Contralor y ordenamos el archivo del caso sin mayor pronunciamiento.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió Opinión de Conformidad. La Juez Asociada señora Rodríguez Rodríguez concurre con el resultado sin opinión escrita. El Juez Asociado señor Rivera Pérez emitió Opinión Disidente.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Manuel Díaz Saldaña,
en su capacidad como Contralor
del E.L.A. de P.R.

    Peticionario

       vs.

                        MD-2006-2      Mandamus

Hon. Aníbal Acevedo Vilá, en
su capacidad como Gobernador
del E.L.A. de P.R.; y Hon.
Juan C. Méndez, en su capacidad
como Secretario de Hacienda

    Recurrido

Opinión de Conformidad emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 30 de junio de 2006.

Estoy conforme con el dictamen de la mayoría del Tribunal de **denegar** el recurso instado por el Contralor de Puerto Rico en el caso de autos. Ello en vista de que la controversia particular entre el peticionario y el Gobernador de Puerto Rico que motivó este pleito, en estos momentos, **se desvaneció**. El recorte presupuestario anunciado por el Gobernador y que el Contralor impugnaba aquí, a última hora no llegó a materializarse. De pronto no tenemos nada concreto que resolver y procede, pues, que ordenemos el archivo del recurso pendiente.

Lo anterior no obstante, vista la opinión disidente que se ha emitido en el caso de autos, creo menester abordar la vital cuestión que está

presente al fondo de la acción instada por el Contralor. Me parece necesario destacar que existe otro parecer jurídico sobre el asunto en controversia, distinto al de la opinión disidente. Me refiero a la cuestión de si el Gobernador de Puerto Rico tiene facultad para ordenar recortes como el del caso de autos **en un presupuesto ya aprobado**, cuando las asignaciones dispuestas en éste, exceden los recursos disponibles. La cuestión se refiere particularmente a la facultad del Gobernador: (1) sobre aquellas asignaciones dispuestas **en el presupuesto anterior**, cuando éste vuelve a estar vigente; y (2) que atañen a entidades **que no forman parte** de la Rama Ejecutiva. ¿Qué límites tiene el Gobernador en tales circunstancias?

Se trata de un asunto importante que no está atendido de manera concreta en el texto de la Constitución del país, por lo que ha sido objeto de graves disputas entre la Rama Ejecutiva y la Rama Legislativa. Veamos.

II

Si hay algo que resalta de modo contundente del designio constitucional adoptado por el propio pueblo de Puerto Rico en 1952 es la **preeminencia del Gobernador frente a la Asamblea Legislativa en la determinación de los asuntos públicos del país, sobre todo en los relativos al presupuesto**. Don José Trías Monge, en su monumental obra

sobre nuestra Constitución, explica una y otra vez,[2] que a pesar de que la ocasión era propicia para ello, la Convención Constituyente **no logró** las reformas necesarias para evitar que hubiese una excesiva concentración de poderes en el Ejecutivo y un desnivel con respecto a los de la Asamblea Legislativa. Indica Trías Monge que

> ". . .la Asamblea Legislativa de tiempos de la Convención Constituyente era un organismo de prestigio y eficiencia declinante;. . .a cargo de un papel dependiente y pasivo frente a la Rama Ejecutiva. . ."

y que ello contribuyó en gran medida a que no se lograse establecer en la Constitución un claro esquema "de responsabilidades verdaderamente compartidas". Trías Monge, *supra,* pág. 140.

Como se sabe, nuestra Constitución **dista mucho de incorporar un esquema puro de separación de poderes**. Así pues, Serrano Geyls indica que **"varios desarrollos de gran importancia han constituido desviaciones considerables de la teoría tradicional de la separación de poderes"**. Derecho Constitucional de Estados Unidos y Puerto Rico, Ed. 1986, Vol. I, pág. 581. Uno de esos desarrollos es la intensa participación del Ejecutivo en el proceso legislativo, sobre todo en lo relativo al presupuesto.

La preeminencia del Gobernador con respecto al presupuesto surge patentemente al considerar, a la luz del historial constitucional, el proceso que da lugar a la

---

[2] Véase, *Historia Constitucional de Puerto Rico*, Vol. III, págs. 107-114; 135-140; 152-153; 162-163.

confección e implantación del presupuesto, y al examinar **en conjunto** las disposiciones constitucionales sobre el particular. En primer lugar, en la Sección 4 del Art. IV se le encomienda al Gobernador dirigirle anualmente un mensaje a la Asamblea Legislativa sobre las condiciones del Tesoro de Puerto Rico y sobre los desembolsos propuestos para el año económico siguiente. Es el Gobernador, pues, quien inicia el proceso de confeccionar y aprobar el presupuesto, presentándole a la Legislatura los proyectos de administración sobre el particular.

Una vez las cámaras legislativas aprueban las medidas presupuestarias, éstas no se convierten en ley hasta que el Gobernador les extiende su conformidad y les imparte su firma. En ese proceso, el Gobernador puede "eliminar una o más partidas, **o disminuir las mismas, reduciendo al mismo tiempo los totales correspondientes**" cuando algún proyecto de ley "asigne fondos en más de una partida". Esta facultad, el llamado "**veto de partidas**", le permite al Gobernador realizar **modificaciones de las partidas y del total presupuestario sin ninguna intervención legislativa**, y la Asamblea Legislativa **no tiene facultad alguna para revocar las referidas acciones del Gobernador, ni siquiera por mayoría especial**. Véase, *Diario de Sesiones de la Constituyente*, Vol. II, pág. 879 y Vol. III, págs. 1950-1951.

Finalmente, en casos en que no se logra aprobar un presupuesto para un año económico, por lo que por mandato constitucional continúa rigiendo el presupuesto del año

anterior, **es el Gobernador quien autoriza los desembolsos presupuestarios correspondientes**.

Como puede observarse, la injerencia del Gobernador sobre todo lo relacionado al presupuesto, según lo dispuesto por la Constitución, es abarcadora y determinante. Es tan amplia esa injerencia que uno de los asesores principales de la Convención Constituyente, el profesor Carl J. Friedrich, criticó más tarde que se hubiese concentrado tanto poder sobre el presupuesto en el Gobernador porque, según él, se reducía la Legislatura **"a poco más que un sello de goma"**.[3] (Énfasis suplido).

Es menester resaltar que la crítica de Friedrich mencionada antes surgió precisamente por razón de la disposición constitucional otorgándole al Gobernador el llamado **veto de partidas**, referido antes. Friedrich estimaba que tal facultad **"hacía demasiado fuerte la posición del Jefe del ejecutivo"**[4] con respecto al presupuesto. (Énfasis suplido.) El poder de vetar o modificar partidas, fijado en la Sección 20 del Art. III de la Constitución, fue tomado directamente de la Carta Orgánica Jones y correspondía al Artículo 34 de dicha Carta. Se trataba de una disposición que fue interpretada por este Tribunal en tres ocasiones: Ferrao v. Cordero, Auditor, 67 D.P.R. 337 (1947); León Parra v. Fitzimmons, 61 D.P.R. 351 (1943), y en, De La Rosa v. Winship, Gobernador, 47 D.P.R. 330 (1934). En dichas

---

[3] Véase el capítulo introductorio de la obra *La Nueva Constitución de Puerto Rico*, págs. 15-26, particularmente la pág. 21.
[4] *Ibid*.

decisiones resolvimos concretamente que el poder del Gobernador de vetar partidas presupuestarias incluía el poder de **reducir** dichas partidas. Más aún, también resolvimos que se trataba de un amplio poder que tenía el Gobernador, **de naturaleza legislativa**, e intimamos que era tan amplio como la misma facultad legislativa sobre el presupuesto. Incluso señalamos que al Gobernador ejercer tal poder **no se violaba la doctrina de separación de poderes. Ello porque cuando el Gobernador ejercía dicho veto, actuaba como parte del proceso legislativo**. De la Rosa v. Winship, Gobernador, *supra*, pág. 334. En el Informe de la Rama Legislativa de la Convención Constituyente se hizo claro que al otorgarle al Gobernador el veto de partidas en la Sec. 20 del Art. III de la Constitución se procuraba concederle **la misma facultad que éste ya tenía sobre el veto de partidas, en virtud del Art. 34 de la Carta Jones**. Véase, *IV Diario de Sesiones de la Convención Constituyente*, 2586.

Tenía razón, pues, Friedrich al pensar que al otorgarle el veto de partidas al Gobernador se fortalecían enormemente sus facultades sobre el presupuesto. Nótese que dicho poder se otorgó **tal como estaba constituido entonces** en el Art. 34 de la Carta Jones, y **según lo había interpretado este Tribunal**. Reiteradamente hemos resuelto que cuando se toma una norma jurídica, de otro ordenamiento, debe presumirse que se adopta también la interpretación y alcance que tenía dicha norma en ese ordenamiento. Véase, Rodríguez Rosado v. Syntex, res. el 30 de septiembre de 2003, 160 D.P.R. ___ (2003), 2003

TSPR 145, 2003 JTS 147; Pueblo v. Vargas De Jesús, 146 D.P.R. 702, 709-710 (1998); Pérez Maldonado v. JRT, 132 D.P.R. 972 (1993). En este caso, no es necesario descansar en este conocido principio de hermenéutica pues sabemos por el propio historial constitucional que en la propuesta de la Escuela de Administración Pública a la Convención Constituyente, recomendando que se adoptara en la Constitución el veto de partidas de la Carta Jones, se citaba la jurisprudencia de este Tribunal sobre el referido Art. 34 de la Carta Jones. Véase, *La Nueva Constitución*, *supra*., págs. 424-426. Véase, además, *Diario de Sesiones*, *supra*, Vol. II pág. 879, Vol. III págs. 1950-1951.

En resumen, pues, al otorgarle al Gobernador el **veto de partidas**, la intención clara de los miembros de la Convención Constituyente fue la de concederle un amplísimo poder sobre el presupuesto. El asunto se aprobó en la Convención Constituyente con clara conciencia de lo que se hacía y con muy poco debate en oposición. Véase, Trías Monge, *supra*, págs. 162-163.

III

A la luz de todo lo anterior, parece lógica una sola conclusión con respecto al asunto que aquí nos concierne. Dado que la Constitución le encomienda vastos poderes al Gobernador con respecto a la confección, aprobación e implantación del presupuesto, por implicación su autoridad también incluye la facultad y el deber de velar porque se

cumpla **siempre** el fundamental mandato incorporado en la Sección 7 del Art. VI de la Constitución, de que las asignaciones presupuestarias correspondientes a un año económico no podrán exceder los recursos totales calculados para dicho año. No tendría coherencia jurídica alguna que se exija constitucionalmente que en cualquier año las asignaciones presupuestarias de ese año no pueden exceder los recursos anticipados para el mismo, pero que dicho principio fundamental no tenga que seguirse cuando las asignaciones en un año particular surgen del presupuesto del año anterior. Los esenciales propósitos económicos y políticos que informan el principio que prohíbe los déficits presupuestarios son válidos siempre, y no hay nada en el historial de la Constitución que permita suponer lo contrario, sobre todo cuando en el Informe a la Convención Constituyente sobre las disposiciones constitucionales relativas al presupuesto se enfatizó que con éstas se procuraba **"mantener la estabilidad económica del gobierno"**. *IV Diario de Sesiones* 2587.

Tampoco tendría coherencia jurídica alguna que se le concediesen al Gobernador los abarcadores poderes sobre el presupuesto que se le dieron, sobre todo el veto de partidas con el alcance y significado que ya hemos precisado, pero que se le hubiese negado la facultad de aplicar el veto de partidas al llamado presupuesto constitucional; es decir, al presupuesto dispuesto en la Sección 6 del Art. VI de la Constitución. Lo lógico, más bien, es inferir que la facultad y deber del Gobernador de evitar presupuestos deficitarios se

extiende **a cualquier presupuesto**, incluyendo el de un año anterior que entra en vigor también para el siguiente año económico porque por impase entre las ramas políticas no se logró aprobar un presupuesto propio para ese año.

Del indiscutible historial de la Constitución, pues, surge claramente que con relación a la situación prevista en la Sección 6 del Art. VI de la Constitución, el llamado presupuesto constitucional, el Gobernador tiene el deber de ejercer su discreción para lograr que se realice el referido mandato de la Sección 7 de ese mismo Artículo, de que las asignaciones no excedan los recursos anticipados. Ello, sujeto sólo a lo dispuesto en la Sección 8 del Art. VI sobre las **prioridades** en los desembolsos. Pero, más allá de esas prioridades, al procurar un balance entre asignaciones y recursos presupuestarios, **el Gobernador sólo está limitado por su buen juicio con respecto a lo que requiere el bien común**. Conforme a lo que sucedió en la Convención Constituyente, a las inferencias incuestionables que surgen del historial de la Constitución y del análisis contextual de nuestra ley fundamental, el Gobernador tiene clara autoridad constitucional para hacer los ajustes y reducciones presupuestarias que en buena lid procedan, incluso la que se cuestionó en el caso de autos.[5]

---

[5] Debe quedar claro que de ningún modo se juzgan aquí los **méritos** de la reducción concreta impugnada en el caso de autos. Si fue acertada o no es un asunto político que rebasa la evaluación judicial. Sólo se afirma aquí que el Gobernador tiene facultad constitucional para hacer reducciones como la de autos. Nada decimos o intimamos sobre si fue prudente realizarla o no.

En vista de lo anterior, no tiene razón el Contralor en sus planteamientos ante nos en este caso, por lo que procede que se deniegue el recurso solicitado.


                              JAIME B. FUSTER BERLINGERI
                              JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Manuel Díaz Saldaña, en

su capacidad como Contralor

del Estado Libre Asociado de

Puerto Rico                                    MD-06-02

          Peticionario

              v.

Hon. Aníbal Acevedo Vilá, en
su capacidad como Gobernador
del Estado Libre Asociado de
Puerto Rico; y Hon. Juan
Carlos Méndez en su capacidad
como Secretario de Hacienda
          Demandados

Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez.


San Juan, Puerto Rico, a de 30 de junio de 2006.

La Mayoría procede a denegar nuevamente por académico el presente recurso. Aunque no utilizan expresamente como fundamento tal doctrina, su razonamiento queda allí enmarcado. Sostienen que no debe expedirse el auto solicitado para resolver una controversia que ya ha sido resuelta por la Rama Ejecutiva y la Legislativa. Ciertamente, el proceso político entre la Rama Legislativa y la Ejecutiva, dirigido a crear fuentes de recaudo adicionales para el año fiscal 2005-2006 concluyó. No obstante, tal controversia es distinguible de la presente. La primera quedó enmarcada como una

cuestión política, la nuestra contiene un asunto justiciable de alto interés público.

Puntualizan que dicho tipo de recurso sólo ha de expedirse **"en circunstancias extraordinarias"** cuando el balance de los intereses envueltos amerita la intervención del foro judicial. Sostienen que el presente caso no contiene tales circunstancias. Discrepamos de tal criterio y curso de acción.

El asunto relacionado con la intervención impropia e indebida del Gobernador de Puerto Rico con los fondos públicos asignados por estatuto a la Oficina del Contralor, está presente, tiene vigencia y está vivo. Conducta de tal naturaleza ha sido observada por el Gobernador en forma recurrente y repetitiva, incurriendo en acciones muy serias y graves, violatorias al esquema democrático constitucional vigente. El Gobernador de Puerto Rico no tiene el poder ni la facultad para, mediante Orden Ejecutiva, enmendar una ley vigente que está constitucionalmente obligado a cumplir y hacer cumplir. Está impedido de incurrir en tal actuación para intervenir los fondos asignados por disposición legislativa a la Oficina del Contralor, para sufragar sus gastos. El cuadro presente en el caso ante nos, contiene las **"circunstancias extraordinarias"** que requiere nuestro ordenamiento jurídico para que la intervención de este Tribunal sea imprescindible. La **"prudencia y la experiencia"** es el fundamento principal

para hacer mandatoria la intervención de este Tribunal para proteger y garantizar a nuestro pueblo **"los mejores intereses de la justicia y la democracia"**.

Al no intervenir este Tribunal en este asunto claudica a su ministerio de proteger y garantizar al pueblo su democracia, frente a la crisis constitucional más grave y seria de su historia. Hoy, con este nefasto pronunciamiento el pueblo no ha contado con su principal recurso para garantizar que su sistema de gobierno democrático funcione, el **TRIBUNAL SUPREMO DE PUERTO RICO**. DISENTIMOS con vehemencia de lo aquí actuado por la Mayoría.

I

El presupuesto de la Oficina del Contralor de Puerto Rico, de ahora en adelante el Contralor, para el año fiscal 2005-2006 ascendía a la suma de $42,000,000.

El Gobernador de Puerto Rico, de ahora en adelante el Gobernador, dispuso el desembolso de los fondos asignados a la Rama Legislativa, a base de lo establecido en la Resolución Conjunta Núm. 927 de 30 de junio de 2004, mediante la Orden Ejecutiva 2005-58 de 30 de agosto de 2005, enmendada por la Orden Ejecutiva 2005-78 de 16 de diciembre de 2005. La asignación presupuestaria a la Rama Legislativa totalizó $106,600,000.

El pasado 26 de abril de 2006, el Gobernador promulgó la Orden Ejecutiva 2006-10, en adelante OE-2006-10, por la

que instruyó al Secretario de Hacienda de Puerto Rico, de ahora en adelante el Secretario, a cómo proceder con el desembolso de dichos fondos durante los meses de mayo y junio de 2006. Por virtud de la misma, redujo a la Oficina del Contralor su partida de nómina a un setenta y cinco por ciento (75%) de los fondos asignados a esa dependencia, bajo custodia y control del Secretario. Tal actuación tuvo el efecto directo de reducir unilateralmente los fondos disponibles para la operación de esa dependencia.

Mediante comunicación de 25 de abril de 2006, cursada antes de emitida por el Gobernador su OE-2006-10, el Contralor le solicitó por escrito que desistiera de su intención de intervenir con sus fondos asignados por disposición legislativa para los gastos de operación de su oficina. No recibió ninguna respuesta, salvo copia de la OE-2006-10.

El Contralor presentó recurso de *mandamus* contra el Gobernador y el Secretario, invocando nuestra jurisdicción original. Alega que el Gobernador carece de autoridad constitucional o estatutaria para reducir unilateralmente los fondos públicos destinados a una entidad para sufragar sus gastos, que no forma parte de la Rama Ejecutiva. Sostiene que cualquier intento a esos efectos viola el principio constitucional de separación de poderes y la garantía de independencia funcional que disfruta esa oficina bajo la Constitución de Puerto Rico y nuestra

infraestructura jurídica estatutaria. Solicita una orden dirigida al Gobernador para que se deje sin efecto la parte correspondiente de la OE-2006-10 que pretende intervenir con sus fondos. Solicita, además, le ordenemos al Secretario que certifique la suma total de los fondos, bajo su custodia y control, disponible para sufragar los gastos presupuestados de su oficina por disposición de la Resolución Conjunta Número 927, de 30 de junio de 2004.

El 1 de mayo de 2006, el Gobernador y el Secretario presentaron escrito solicitando de este Tribunal la desestimación del recurso de *mandamus*. Arguyen que la alegada crisis fiscal que sufrió Puerto Rico se reduce **a que el gasto gubernamental presupuestado para el resto del año fiscal asciende a la suma de $2,000,000,000. No obstante, hay disponible sólo $1,021,000,000 que se estimó habrían de ingresar en las arcas del Departamento de Hacienda durante los meses de mayo y junio de 2006.** El Gobernador sostiene que esta situación lo obligó a utilizar la autoridad que le confiere el Artículo VI, Sección 6 de la Constitución de Puerto Rico[6] para reducir de forma sustancial los desembolsos de fondos públicos a diferentes organismos gubernamentales, de forma tal que los recursos económicos con que ha de contar el gobierno durante los meses de mayo y junio del año fiscal 2005-2006 puedan ser

---

[6] Documentos Históricos, 1 L.P.R.A., Art. VI, Sec. 6, pág.408.

utilizados para garantizar que el Pueblo reciba los servicios esenciales de seguridad y salud, así como para asegurar el repago de las obligaciones del gobierno. Expresa que mostró deferencia a la importancia de las funciones del Contralor, pues redujo el presupuesto de esa oficina a sólo un setenta y cinco por ciento (75%) de la partida de nómina, cuando a la Rama Ejecutiva la redujo a un cuarenta y seis por ciento (46%) y a la Rama Legislativa, a un cincuenta por ciento (50%). El Gobernador puntualiza que el Contralor no estuvo satisfecho e insistió en recibir de forma inmediata el cien por ciento (100%) de sus fondos para los últimos dos (2) meses del año fiscal en cuestión, mayo y junio de 2006; no obstante la alegada crisis fiscal que sufrió el país. Expresa que, a diferencia del Contralor, el Juez Presidente del Tribunal Supremo de Puerto Rico y el Presidente del Senado reconocieron la magnitud de la crisis fiscal del país y, aunque opinaron que los poderes concedidos al Gobernador por el Artículo VI, Sección 8,[7] no permiten que se reduzcan los desembolsos a sus respectivas instituciones, "por lo menos han tenido suficiente solidaridad con el Pueblo como para limitar sus reclamos a que se les reconozca un crédito pagadero durante el próximo año fiscal". Afirma que si este Tribunal accede a lo que solicita el Contralor "se verá enfrascado en la tarea de determinar cómo y a qué fin

---

[7] Const. E.L.A., *supra*, Art. VI, Sec. 8, pág. 410.

destinar los fondos del Estado, en medio de una crisis fiscal, pero sin contar con las destrezas y poderes para manejar tal responsabilidad de forma efectiva". Sostiene que esa no es nuestra tarea. El Gobernador y el Secretario alegan que tales consecuencias pueden ser evitadas desestimando el presente recurso. Sostienen su pedimento en la falta de jurisdicción de este Tribunal para actuar porque lo solicitado por el Contralor es inoportuno, el recurso plantea una cuestión política, el Contralor carece de capacidad jurídica y de legitimación activa para presentar su recurso. Por último, plantean que el recurso no fue perfeccionado a tenor con la ley porque la petición no fue juramentada y pretende utilizar el vehículo de *mandamus* para cuestionar una actuación que involucra el ejercicio de la discreción del Primer Ejecutivo[8].

El 5 de mayo de 2006, el Contralor replicó por escrito a la solicitud de desestimación presentada. Controvierte la caracterización que hicieran el Gobernador y el Secretario sobre la cifra de $2,000,000,000 a la que alegadamente ascendió el gasto gubernamental presupuestado para el resto del año fiscal en cuestión, o sea los meses de mayo y junio de 2006. Afirma que tal caracterización no es correcta. Sostiene que no se trata de "gasto gubernamental presupuestado" sino de un estimado de los

---

[8] El 2 de mayo de 2006, el Contralor presentó una moción anejando juramento al recurso.

desembolsos que se necesitarían hacer para absorber el gasto gubernamental, **lo que incluye el presupuestado y el gasto no presupuestado. Puntualiza que en eso exactamente es que reside la crisis alegada. Afirma que el estimado de $2,000,000,000 incluye los excesos en gastos proyectados sobre lo presupuestado en los que, para el 6 de abril de 2006, habían incurrido por lo menos 48 agencias del gobierno de la Rama Ejecutiva.** Sostiene que el Juez Presidente del Tribunal Supremo, mediante carta, **le informó al Gobernador que la Rama Judicial contemplaba terminar el año fiscal 2005-2006, con "un sobrante a consecuencia de las medidas de austeridad que tomamos durante el presente año". Arguye que algo similar aduce la carta del Presidente del Senado al Gobernador.** Expresa que con relación a la cifra de $1,021,000,000 la realidad es que no se explicó al país adecuadamente cómo se formuló. Al presente, el Gobernador ni el Secretario han presentado cifra alguna sobre cuánto se recaudó y cuánto queda por cobrar por concepto de la contribución sobre ingresos pagadera el 18 de abril de 2006. El Contralor sugiere cuál es la causa o origen de la alegada crisis fiscal. Alega que el Gobernador está facultado y obligado a hacer los ajustes necesarios en la Rama Ejecutiva a los fines de que los desembolsos no sobrepasen los fondos públicos disponibles. El Contralor formula ciertas y determinadas interrogantes sobre tal asunto. ¿Cuándo es que el Gobernador viene

obligado a hacer tales ajustes en la Rama Ejecutiva? ¿Cuándo era inminente que se habría de agotar los fondos públicos en esa rama de gobierno; tan pronto ese escenario se divisó al final del camino? Afirma que es de conocimiento público que el Gobernador anunció muy temprano durante el transcurso del año fiscal en cuestión que ya divisaba ese escenario en la Rama Ejecutiva. Sostiene que en ese momento existían dos cursos de acción como alternativas. **Primero**, comenzar un proceso ordenado de recorte de gastos en la Rama Ejecutiva. **Segundo**, confiar en que en algún momento se aprobarían medidas de recaudo adicionales. Afirma que el Gobernador descansó en la segunda opción. Sostiene que la prudencia y la Constitución de Puerto Rico requerían que se recurriera desde entonces a la alternativa de un recorte ordenado de gastos en la Rama Ejecutiva. Afirma que no debió producirse nunca lo que vivimos, un gobierno parcialmente cerrado. Puntualiza que el proceso político, en aquel momento en marcha en la Rama Legislativa, con el que el Gobernador nos indicó que no debíamos intervenir, fue el resultado de acciones u omisiones que se arrastraban, por lo menos, desde el comienzo del año fiscal 2005-2006. Sostiene que el actual exceso en los gastos de la Rama Ejecutiva sobre los presupuestados y por sobre los estimados de ingresos de esa rama de gobierno fue sometida al foro político porque no se atendió adecuadamente como

correspondía. El Contralor es del criterio que el origen de tal exceso es la falta de control de los gastos de la Rama Ejecutiva, en previsión de una negativa legislativa a aprobar legislación para allegar recaudos adicionales.

**El Contralor delimita la controversia ante nos.¿Contiene el Artículo VI, Sección 6 de la Constitución de Puerto Rico, *supra*, y la ley que implanta tal precepto, concebidas para momentos de crisis, cierto límite? ¿Le otorgan, por el contrario, nuestra Constitución y la infraestructura jurídica estatutaria al Gobernador de Puerto Rico la facultad y el poder de producir una crisis y luego manejar casi a su entero arbitrio el presupuesto "de todo el gobierno" y no sólo el de la Rama Ejecutiva?**

El Gobernador, en su escrito, nos solicitó la desestimación del recurso porque, entre otras cosas, de expedirse el recurso hubiéramos interferido con las negociaciones que se conducían, en ese momento, entre las Rama Ejecutiva y la Legislativa. Por su parte, el Contralor arguye que el escrito de la parte recurrida nos propone que le permitamos al Gobernador negociar desde una posición de poder, en una situación fiscal como la que existió en ese momento, aunque carezca de tal facultad; a pesar de los reclamos ante este Tribunal de la parte directamente afectada por el ejercicio de ese poder. Afirma que ese no es el "fino balance" entre los poderes de gobierno que hemos evocado en el pasado. Nos hace

referencia a nuestra Opinión en el caso de <u>Hernández Agosto v. López Nieves</u>.[9]

El Contralor hace referencia a la determinación de este Tribunal en <u>Aponte Hernández v. Acevedo Vilá</u>[10] de desestimar por académico una acción presentada ante nos por los presidentes de los cuerpos legislativos ante una acción similar del Gobernador a la del caso ante nos. Sostiene que en aquella ocasión la actuación de este Tribunal podía explicarse por razón de prudencia. Arguye que este Tribunal procedió de esa forma porque el Gobernador desistió de su actitud de intentar reducir unilateralmente el presupuesto de la Rama Legislativa, y permitió que el proceso político y sus componentes armonizaran sus diferencias sin nuestra intervención.[11] Arguye que tras ese evento, no le parece justificada una ulterior exhortación a la "paciencia y serenidad con el proceso político". Sostiene que existe una diferencia dramática entre aquel escenario y el que nos ocupa. En el caso de <u>Aponte Hernández v. Acevedo Vilá</u>, *supra,* el Gobernador, mediante la Orden Ejecutiva 2005-78, desistió de su curso de acción que los allí demandantes consideraban inconstitucional. En el presente caso el Gobernador insistió en tal curso de

---

[9] 114 D.P.R. 601, 622 (1983).

[10] 2006 T.S.P.R. 24, 166 D.P.R._____(2006).

[11] El aquí suscribiente disintió sin opinión escrita. La Jueza Asociada señora Rodríguez Rodríguez disintió con opinión escrita.

acción. Arguye que el escrito del Gobernador propone que este Tribunal, por segunda vez, demuestre "paciencia y serenidad" ante su reiterada violación constitucional.

El Contralor rebate extensamente cada uno de los argumentos de derecho en los cuales el Gobernador y el Secretario sostienen su pedimento de desestimación del recurso. Pasamos de inmediato a considerar los mismos.

## II

### *MANDAMUS*

El *mandamus* es un recurso extraordinario de equidad "**altamente privilegiado**", que emite el Poder Judicial para obligar a cualquier persona, corporación, junta o tribunal inferior a cumplir con un acto que la ley expresamente ordena como un deber resultante de un empleo, cargo o función pública.[12]

El requisito primordial del recurso de *mandamus* es que se trate de un deber ministerial impuesto por ley. La jurisprudencia ha establecido que la determinación de la procedencia del auto depende de si la actuación solicitada es un deber ministerial o si, por el contrario, involucra el ejercicio de discreción, en cuyo caso no puede

_____

[12] Véase Arts. 649 y 650 del Código de Enjuiciamiento Civil de 1933, 32 L.P.R.A. secs. 3421 y 3422; <u>Noriega Rodríguez v. Hernández Colón</u>, 135 D.P.R. 406 (1994).

expedirse.[13] El acto es ministerial cuando la Constitución de Puerto Rico y la ley prescriben y definen el deber que tiene que ser cumplido con tal precisión y certeza que nada deja al ejercicio de la discreción o juicio. Cuando el acto que debe ser cumplido envuelve el ejercicio de discreción o juicio, no considerado ministerial, está fuera del ámbito del recurso de *mandamus*. La decisión de lo que es, o no, "un deber ministerial" no es algo que se pueda determinar mediante la aplicación de una fórmula inflexible.[14] Si el deber surge o no claramente de las disposiciones estatutarias aplicables es una cuestión sujeta a interpretación judicial que no depende de un juicio *a priori*, fundado exclusivamente en la letra del estatuto. Tal determinación ha de surgir del examen y análisis de todos los elementos útiles a la función interpretativa, del examen paciente y riguroso de la intención legislativa, de la evaluación de todos los elementos de juicio disponibles para auscultar el propósito y significado del estatuto en cuestión.[15]

Al considerar la solicitud de expedición de un auto de *mandamus* no es suficiente que el peticionario tenga un

---

[13] Álvarez de Choudens v. Tribunal Superior, 103 D.P.R. 235 (1975).

[14] Partido Popular v. Junta de Elecciones, 62 D.P.R. 745, 749 (1944).

[15] Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 418 (1982).

derecho claro a lo que solicita, y que el demandado tenga la obligación de permitir el ejercicio de ese derecho. Por tratarse de un auto **"altamente privilegiado"**, los tribunales tienen necesariamente que medir **la totalidad de las circunstancias presentes, tanto al determinar si debe o no expedirse el auto, como también al fijar el contenido de su disposición, de haberlo expedido. El remedio se concede sólo cuando el tribunal está convencido de que con ello se cumplirán propósitos de utilidad social e individual. Es indispensable estimar los efectos que tendrá la intervención judicial en el adecuado cumplimiento de las responsabilidades y deberes del funcionario afectado, al amparo de la Constitución de Puerto Rico y de la ley. Resulta imperativo buscar el más fino "balance y equilibrio" entre los diversos intereses en conflicto.**[16]

Este Tribunal tiene la obligación de tomar en cuenta, al momento de considerar un recurso como el presente, el velar y proteger los intereses públicos que puedan ser perjudicados con la expedición del auto solicitado. Tiene el deber ineludible de proteger y garantizar nuestra forma republicana de gobierno, evitando una intromisión indebida de la Rama Judicial con los procesos de las ramas políticas de gobierno. El criterio que gobierna el asunto ante nos consiste en el impacto que la expedición del auto

---

[16] _Dávila v. Superintendente General de Elecciones_, 82 D.P.R. 264 (1960).

solicitado y nuestra intervención pudiera tener sobre el interés público inmanente del esquema democrático de la Constitución de Puerto Rico. **El presente recurso si presenta las "circunstancias extraordinarias" que requiere nuestro ordenamiento jurídico para que la intervención de este Tribunal sea imprescindible**. La experiencia vivida en dos (2) ocasiones, relativa a alegadas actuaciones iguales o similares del Gobernador nos obliga, como medida prudencial, a intervenir para proteger y garantizar **"los mejores intereses de la justicia y la democracia"**. Nuestra intervención en este asunto resulta imprescindible por razón de utilidad social e individual, por la importancia y relevancia que tiene para nuestro sistema constitucional de gobierno democrático. Nuestra intervención resulta mandatoria ante el reiterado incumplimiento del Gobernador a sus deberes y obligaciones ministeriales, al amparo de la Constitución de Puerto Rico y de la ley.

### III

### DOCTRINA DE ACADEMICIDAD

Por entender que la Mayoría deniega la expedición del recurso por academicidad, por no existir, en la actualidad, un deber ministerial de ley que cumplir de parte del Gobernador, habremos de discutir y aplicar dicha doctrina al caso ante nos.

Hemos expresado que los tribunales pierden su jurisdicción sobre un caso por academicidad, cuando ocurren

cambios fácticos o judiciales durante el trámite judicial de una controversia que tornan en académica o ficticia su solución.[17] En Asoc. de Periodistas v. González[18], citando al Profesor L.H. Tribe, expusimos que "[u]na vez se determina que un caso es académico los tribunales, por imperativo constitucional (ausencia de ´caso o controversia´) o por motivo de autolimitación judicial, deben abstenerse de considerarlo en sus méritos".[19] Lo anterior es corolario del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas, surgidas entre partes opuestas que tienen un interés real en obtener un remedio que haya de afectar sus relaciones jurídicas.[20] Persigue, además, eludir el uso innecesario de recursos judiciales, asegurar la existencia de contiendas que sean vigorosamente litigadas y evitar precedentes innecesarios.[21] Al analizar la academicidad de un caso, debemos evaluar los eventos anteriores, próximos y futuros, a fin de determinar si su condición de

---

[17] Cruz v. Adm. de Corrección, 2005 T.S.P.R. 34, 2005 J.T.S. 39, 164 D.P.R.___(2005).

[18] 127 D.P.R. 704 (1991).

[19] Íd., pág. 719.

[20] E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559 (1958).

[21] C.E.E. v. Depto. de Estado, 134 D.P.R. 927 (1993); Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715 (1980).

controversia viva y presente subsiste con el transcurso del tiempo.[22]

Existen excepciones a la doctrina de academicidad. En virtud de ellas, los tribunales pueden atender un caso aunque haya habido cambios que parecieran tornar académica la controversia. Estas son las siguientes: **1) cuando se plantea en el caso una cuestión recurrente o repetitiva del asunto planteado que tiende a evadir la revisión judicial; 2) en aquellos casos en que la situación de hechos ha sido modificada por el demandado, pero no tiene características de permanencia; 3) donde aspectos de la controversia se tornan académicos, pero persisten importantes consecuencias colaterales;** y, 4) cuando se ha certificado por el tribunal una clase de conformidad con la Regla 20 de Procedimiento Civil[23], y la controversia se torna académica para un miembro de la clase, mas no para el representante de la misma.[24]

La excepción sobre el carácter recurrente o repetitivo de la controversia exige el estudio de tres factores: la probabilidad de la recurrencia, las partes involucradas en

---

[22] San Antonio Maritime v. P.R. Cement Co., 153 D.P.R. 372 (2001); Emp. Pur. Des.,Inc. v. H.I.E.T.E.L., 150 D.P.R.924 (2000); Pres. del Senado, 148 D.P.R. 737 (1999); P.N.P. v. Gobernador I, 139 D.P.R. 643 (1995); Asoc. de Periodistas v. González, 127 D.P.R. 704 (1991); Noriega v. Gobernador, 122 D.P.R. 650 (1988).

[23] 32 L.P.R.A. Ap.III, R.20.

[24] Cruz v. Adm. de Corrección, *supra*; Asoc. de Periodistas v. González, *supra*.

el procedimiento y la probabilidad de que la controversia evada la revisión judicial.[25] Para que opere la referida excepción, la recurrencia no tiene que ser entre las mismas partes.[26]

Además del carácter recurrente o repetitivo del asunto planteado y las partes en el litigio, dicho asunto debe ser de tal naturaleza que puede evadir su adjudicación o revisión. Esto sucede con mayor frecuencia en aquellas controversias que son, de por sí, de muy corta duración, **aunque pueden existir otras razones**, además de la brevedad cronológica, que ocasionen que una controversia sea capaz de eludir la revisión judicial.[27]

Aunque los tribunales pierden su jurisdicción sobre un asunto cuando ocurren cambios durante el trámite judicial de un caso que hacen que este pierda actualidad, los cambios fácticos o judiciales a los que hace referencia la jurisprudencia **no pueden ser, bajo ninguna circunstancia, resultado de una actuación del demandado para burlar nuestra facultad revisora respecto a un caso que está sub júdice. En la situación en la que el demandado cese de su actuación ilegal o impropia de forma voluntaria, sin que**

---

[25] Íd.

[26] Com. de la Mujer v. Srio. de Justicia, *supra*.

[27] Cruz v. Adm. de Corrección, *supra*; Angeira v. J.L.B.P., 150 D.P.R. 10 (2000); El Vocero v. Junta de Planificación, 121 D.P.R. 115 (1998); Asoc. de Periodistas v. González, *supra*.

MD-2006-2

**existan garantías de que en el futuro no habrá de incurrir nuevamente en tal conducta, el caso no se tornará académico. Este cese voluntario no impedirá que los tribunales puedan ejercer su función de determinar la legalidad del acto incurrido y de decidir sobre el caso ante si, pues de lo contrario, sería permitir que el demandado vuelva a incurrir en la conducta desistida.[28] El demandado debe demostrarle al tribunal, que no existe una probabilidad razonable de que la conducta ilegal alegada vuelva a repetirse.[29]**

El presente caso contiene una situación verdaderamente preocupante respecto a la aplicación de los principios que comprenden la doctrina de la academicidad frente a violaciones graves y muy serias a la Constitución de Puerto Rico y a la ley, en forma recurrente, de parte del Gobernador.

Tomamos conocimiento judicial que el Gobernador informó desde el principio del cuatrienio sobre la existencia de un déficit presupuestario. También tomamos conocimiento judicial del hecho que desde principio del año fiscal 2005-2006 el Gobernador anunció que los gastos presupuestados habrían de exceder los estimados de ingresos a recaudarse.

---

[28] City of Mesquite v. Aladdin's Castle, 455 U.S. 283 (1982). Véase, además, Rullán v. Fas Alzamora, 2006 T.S.P.R. 5, 2006 J.T.S. 12, 166 D.P.R.___(2006).

[29] Gwaltney of Smithfield, Ltd. V. Chesapeake Bay Foundation Inc., 484 U.S. 49 (1987).

El Gobernador optó, a principio del presente año natural 2006, por reducir unilateralmente mediante Orden Ejecutiva los fondos asignados por estatuto a la Rama Legislativa. Tal acción produjo la presentación de dos (2) pleitos por los Presidentes de los cuerpos legislativos ante el Tribunal de Primera Instancia. Dichos asuntos fueron traídos ante nos mediante recursos de certificación. **El Gobernador solicitó se archivaran por académicos esos asuntos porque había depuesto su actitud de reducirle a la Rama Legislativa su presupuesto, por haber sido identificadas unas fuentes de ingresos que excedían los estimados de ingresos formulados previamente y que hacían innecesaria su intervención con el presupuesto de esa rama de gobierno.** Hace escasamente unos meses este Tribunal tuvo la oportunidad de dirimir esa controversia y de pautar norma al respecto y una Mayoría decidió no hacerlo por estimar que el asunto se convirtió en académico. Disentimos de tal curso de acción sin opinión escrita, en aquel momento, porque entendíamos que el Gobernador, con su proceder, estaba tratando de evadir la revisión de su actuación por este Tribunal. Nos referimos al caso de Aponte Hernández v. Acevedo Vilá, *supra*. La Mayoría entendió que aquella controversia era académica porque no existía una probabilidad razonable de que la misma volviera a repetirse y porque era muy especulativo concluir que una situación de crisis fiscal pudiera suscitarse en el futuro

o que el Gobernador volviera nuevamente a reducir unilateralmente los fondos disponibles de otra rama de gobierno para sufragar sus gastos, presupuestados por disposición legislativa. No fue así.

Posteriormente el Gobernador redujo no sólo los fondos asignados al Contralor, sino los de la Rama Judicial y nuevamente los de la Rama Legislativa. Nos preguntamos, ¿cuándo era inminente que se le agotarían los fondos públicos disponibles para la Rama Ejecutiva? Lo cierto es que la insuficiencia de fondos de esa rama de gobierno apunta a los meses de mayo y junio de 2006, el final del año fiscal 2005-2006. ¿Desde cuándo se conocía tal eventualidad? ¿Qué medidas y ajustes realizó el Gobernador para reducir o eliminar tal escenario?

No tenemos duda alguna que la actuación del Gobernador, de hace escasamente unos meses, de deponer su actitud de intervenir los fondos de la Rama Legislativa, tuvo el propósito directo de tornar en académica aquella controversia que estaba ante nos. Por eso disentimos. Este Tribunal no debió dejar en manos del Gobernador la potestad de decidir cuándo este foro habría de revisar un planteamiento tan serio sobre actuaciones de su parte de violación a principios y derechos constitucionales y estatutarios. Tenemos ante nos un caso que fue traído con la premura y la urgencia que requiere la situación. El Gobernador ha recurrido en su conducta. No existe garantía

alguna de que en el futuro el Gobernador no habrá de incurrir nuevamente en acciones similares. No ha demostrado la inexistencia de una probabilidad razonable de que vuelva a repetirse. Por el contrario existe, ante el cuadro político de un gobierno compartido, la probabilidad razonable de que una situación igual o similar vuelva a producirse. Persisten en este caso importantes consecuencias no colaterales sino directas, principalmente relacionadas con el funcionamiento del sistema de gobierno democrático del país, que le garantiza al pueblo la Constitución de Puerto Rico.

La Mayoría permite con su inacción que el Gobernador vuelva a eludir nuestra revisión judicial e incurrir en el futuro en conducta igual o similar. Concluimos que este caso no es académico ni inmeritorio y el país está pendiente del cabal cumplimiento de nuestro ministerio. Hoy este Tribunal claudica su función de preservar, proteger y garantizar al pueblo de Puerto Rico el funcionamiento efectivo y eficiente de su sistema de gobierno democrático.

## IV

## LEGITIMACIÓN ACTIVA

Tenemos la obligación ineludible de cerciorarnos de que las partes que promueven la controversia ante nos están particularmente capacitadas para así hacerlo, y de que su interés es uno de tal naturaleza que, con toda

probabilidad, habrán de proseguir su causa de acción vigorosamente, y habrán de traer a la atención del tribunal las cuestiones en controversia.[30]

La doctrina de legitimación activa exige que el promovente de la acción demuestre que cumple con determinados requisitos indispensables, a saber: **(1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso y no uno abstracto e hipotético; (3) que la causa de acción debe surgir bajo el palio de la Constitución o de una ley; y (4) que exista una conexión entre el daño sufrido y la causa de acción ejercitada.**[31]

Tanto el Gobernador como el Secretario sostienen que el Contralor carece de legitimación activa para presentar el recurso ante nos. Ello porque éste no cumple con los requisitos indispensables a los efectos que el promovente de la acción demuestre que ha sufrido un daño claro, palpable e inmediato. Sostienen que el daño reclamado por el Contralor es uno de naturaleza generalizada que debe ser atendido en la esfera política. No les asiste la razón.

El asunto ante nos se refiere a actuaciones del Gobernador que han interferido con las operaciones de la Oficina del Contralor, cuyas funciones están

---

[30] Noriega Rodríguez v. Hernández Colón, *supra*, pág. 407; Hernández Agosto v. Romero Barceló, *supra*.

[31] Noriega Rodríguez v. Hernández Colón, *supra*; Hernández Torres v. Hernández Colón, 131 D.P.R. 593 (1992); Hernández Torres v. Gobernador, 129 D.P.R. 824 (1992).

constitucionalmente dirigidas a fiscalizar a las tres (3) ramas de gobierno, sobre la legalidad del gasto de los fondos públicos.

El Contralor ha cumplido con su obligación de alegar y sostener adecuadamente que la actuación del Gobernador le ha causado un daño claro, palpable, preciso e inmediato a su oficina. Alegó, además, que su causa de acción surge de la Constitución de Puerto Rico y de la ley; que existe una conexión entre el daño sufrido a la operación de su oficina, que tiene una función constitucional, y la acción ejercitada. Luego de varios intentos infructuosos del Contralor por obtener una reacción oficial del Secretario de Hacienda respecto a la forma en que se harían los desembolsos para el pago de su nómina, a tenor con la OE-2006-10, el Secretario de Hacienda notificó por escrito al Contralor, el 5 de mayo de 2006, que tal reducción tendría un efecto inmediato. Ello provocó el ajuste, por parte del Contralor, de los horarios y días de trabajo del personal de su oficina con el propósito de enfrentar la reducción de los fondos bajo custodia y el control del Secretario para el pago de nómina durante la primera quincena de mayo de 2006. Ello se agravó por el hecho de que para el 5 de mayo de 2006, fecha de la referida notificación del Secretario, habían concluido cinco (5) días de servicios prestados por todo el personal de la Oficina del Contralor. El Contralor entendió que del lenguaje contenido en la OE-2006-10,

respecto a la reducción de los fondos bajo la custodia y control del Secretario, era imposible descifrar cómo se harían los desembolsos referentes a los gastos de nómina.[32]

La acción tardía del Secretario de proveer directrices al respecto, provocó que el Contralor realizara ajustes en servicios, horarios y salarios para poder lograr la reducción en la nómina requerida por el Secretario. Ajustes que tuvieron que ser realizados durante los seis (6) días laborables que restaban de la primera quincena de mayo de 2006. Como resultado de lo anterior, el personal de la Oficina del Contralor sufrió una reducción de su jornada de trabajo, de modo que las horas trabajadas no excedieran el equivalente al setenta y cinco porciento (75%) de su salario. Tal proceder afectó directa y en forma inmediata la operación de esa dependencia.

El Gobernador y el Secretario sostienen que el Contralor no tiene capacidad jurídica para instar el presente recurso porque sus facultades para actuar son

---

[32] Según el Contralor existían dos (2) posibles interpretaciones de la OE-2006-10 respecto al pago de nómina: (1) el pago completo de nómina durante las primeras tres quincenas de mayo y junio. Ante esa eventualidad, en o alrededor del 16 de junio de 2006 se produciría el cierre total de la Oficina del Contralor por no contar con la totalidad de los fondos disponibles, o (2) pagando el 75% de la nómina quincenalmente hasta concluir el año fiscal, lo que, sostiene el Contralor, hubiera afectado en forma inmediata el bolsillo de todo el personal de su oficina.

limitadas y, entre ellas, no está la de incoar pleitos y recursos judiciales, fuera del ámbito específico de hacer valer sus citaciones y órdenes investigativas.

Si la facultad del Contralor para cuestionar en los tribunales una actuación de la Rama Ejecutiva de naturaleza inconstitucional, que afecta en forma directa la operación de su oficina, estuviera condicionada a la previa autorización por la Rama Legislativa, equivaldría a que ésta última controlaría la efectiva operación de la Oficina del Contralor, a quien la Constitución de Puerto Rico le quiso otorgar autonomía administrativa, funcional y fiscal frente a las tres (3) ramas de gobierno. Ello colocaría al Contralor a merced del Poder Legislativo, aún en aquellas instancias en que la actuación de dicha rama de gobierno pudiera interferir con su autonomía. Esto es contrario a la intención de la Asamblea Constituyente de que el Contralor no estuviera sujeto a control alguno de parte de ninguna de las tres (3) ramas de gobierno y pudiera llevar a cabo, con independencia, sus prerrogativas constitucionales.

No tenemos duda alguna de que el Contralor tiene legitimación activa y capacidad jurídica para instar el recurso ante nos. Máxime cuando su acción pretende la intervención del Poder Judicial para reivindicar sus prerrogativas constitucionales y estatutarias, frente a las actuaciones del Gobernador y el Secretario, que interfirieron con su autonomía y rol constitucional.

MD-2006-2

**V**

**CUESTION POLÍTICA–JUSTICIABILIDAD DE LAS CAUSAS**

Consideramos que el asunto que plantea este caso es uno que debe ser objeto de determinación judicial por ser uno justiciable. La autoridad para analizar los aspectos relacionados a la justiciabilidad de las causas, nace del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas, que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas.[33] Los tribunales nos imponemos las limitaciones que emanan de esa doctrina para, entre otras cosas, observar y garantizar el justo balance que se requiere de las distintas ramas de gobierno en la administración de la cosa pública. El análisis de este principio es, por lo tanto, imperativo y necesario dentro de nuestro sistema de separación de poderes. Las limitaciones que surgen de éste imponen un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que, de otro modo, constituiría una clara amenaza para la calidad democrática de nuestro sistema.[34]

La aplicación de las diversas doctrinas que dan vida al principio de justiciabilidad determinan la jurisdicción de los tribunales, particularmente con relación a las

---

[33] E.L.A. v. Aguayo, *supra*.

[34] Íd., pág. 597.

controversias que se le presentan, al amparo de los derechos que garantiza nuestra Constitución y la democracia que instrumenta. Se trata, pues, de una cuestión de umbral que debemos analizar ante las controversias que nos ocupan.[35]

La doctrina de cuestión política, según desarrollada en la jurisdicción federal, surge básicamente de consideraciones sobre el principio constitucional de separación de poderes.[36] Si en un caso hay presente una cuestión política, el caso no será justiciable, y el tribunal debe abstenerse de adjudicarlo. La doctrina de cuestión política plantea, en esencia, que hay asuntos que no son susceptibles de determinación judicial, porque su resolución corresponde a las otras ramas del Gobierno, la Legislativa o Ejecutiva, o en última instancia al electorado.[37]

Una cuestión política no es susceptible de determinación judicial, porque su resolución corresponde propiamente al proceso político de gobierno, que se produce en las otras dos (2) ramas, y no al Poder Judicial.[38]

---

[35] P.P.D. v. Peña Clos I, 140 D.P.R.779 (1996).

[36] Baker v. Carr, 369 U.S. 186, 210 (1962).

[37] Noriega Rodríguez v. Hernández Colón, *supra*, pág. 422.

[38] Silva v. Hernández Agosto, *supra*; Santa Aponte v. Srio.del Senado, 105 D.P.R. 750 (1977); Powell v. McCormack, 395 U.S. 486 (1969).

MD-2006-2

Los criterios judiciales para determinar si el asunto planteado constituye una cuestión política son los siguientes:

(A) La Constitución delega expresamente el asunto en controversia a otra rama del Gobierno.

(B) No existen criterios o normas judiciales apropiadas para resolver la controversia.

(C) Resulta imposible decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales.

(D) Resulta imposible tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno.

(E) Hay una necesidad poco usual de adherirse sin cuestionamiento a una decisión política tomada previamente.

(F) Hay el potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del Gobierno sobre un punto.[39]

Sobre este tema expresan Rotunda y Nowak lo siguiente:

> *The political question doctrine—which holds that certain matters are really political in nature and best resolved by the body politic rather than by courts exercising judicial reviewis [sic] a misnomer. It should more properly be called the doctrine of nonjusticiability, that is, a holding*

---

[39] <u>Baker v. Carr</u>, s*upra*; reafirmado en nuestra jurisdicción en <u>Silva v. Hernández Agosto</u>, *supra*.

> *that the subject matter is inappropriate for judicial consideration. An important consequence of the political question doctrine is that a holding of its applicability to a theory of a cause of action renders the government conduct immune from judicial review.* Unlike other restrictions on judicial review-doctrines such as case or controversy requirements, **standing**, ripeness and prematurely, **abstractness**, mootness, and **abstention**-- all of which may be cured by different factual circumstances, **a holding of nonjusticiability is absolute in its foreclosure of judicial scrutiny.**[40] (Énfasis suplido).

Hemos expresado, aludiendo al profesor Raúl Serrano Geyls, que existen tres (3) vertientes de la doctrina de cuestión política, a saber: **(1) la que requiere que los tribunales no asuman jurisdicción sobre un asunto, porque éste ha sido asignado textualmente por la Constitución a otra rama del Gobierno;** (**2) aquella según la cual los tribunales deben abstenerse de intervenir, bien porque no existen criterios de decisión susceptibles de descubrirse y administrarse por los tribunales, o bien por la presencia de otros factores análogos,** y **(3) la que aconseja la abstención judicial por consideraciones derivadas de la prudencia.**[41]

**Si la Constitución confiere una facultad expresa a una rama de gobierno y ésta es de naturaleza política, no**

---

[40] 1 Rotunda y Nowak, <u>Treatise on Constitutional Law: Substance and Procedure 3er ed.,</u> Sec. 2.16(a), págs. 311-312 (1999).

[41] <u>C.E.S. v. Gobernador</u>, 137 D.P.R. 83, 102 (1994); <u>Noriega Rodríguez v. Hernández Colón</u>, *supra*.

estará sujeta a revisión judicial, salvo que se ejecute incorrectamente afectando derechos constitucionales de igual jerarquía.[42]

Lo realmente importante en los casos que encierran la doctrina de cuestión política, es el análisis sobre si una cláusula constitucional provee derechos que puedan ser compelidos mediante una acción judicial.[43]

La doctrina de cuestión política debe ser aplicada en términos funcionales, a tenor con los hechos específicos de cada caso en particular. La doctrina no es aplicable cuando existen derechos constitucionales individuales importantes que serían afectados si el Poder Judicial no actúa.[44]

Como regla general, la doctrina de cuestión política impide la revisión judicial de asuntos cuya resolución corresponde a las otras ramas políticas del Gobierno o al electorado.[45] En Silva v. Hernández Agosto, *supra*, reiteramos nuestros pronunciamientos anteriores y expresamos que "ante reclamos de cuestión política hemos

---

[42] Silva v. Hernández Agosto, *supra*; United States v. Nixon, 418 U.S. 683 (1974); Powell v. McCormack, *supra*; R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, Colegio de Abogados de Puerto Rico, 1986, Vol. I, págs. 697-698.

[43] L.H. Tribe, American Constitutional Law, 2da. Ed., Nueva York, Ed. Foundation Press, 1988, págs. 98 y 106.

[44] Véase F.W. Scharpf, Judicial Review and The Political Question: A Functional Analysis, 75 Yale L.J. 566-597 (1966); Noriega Rodríguez v. Jarabo, 136 D.P.R. 497 (1994).

[45] Noriega Rodríguez v. Jarabo, *supra*.

**reafirmado el poder de los tribunales de ser los intérpretes finales de los contornos de la Constitución, y para determinar si los actos de una rama de gobierno exceden su autoridad constitucional."[46]**

El Gobernador aduce que la presente controversia gira en torno a una cuestión política, por lo que este Tribunal no debe intervenir. Alega, que de esta Curia adjudicar el recurso instado por el Contralor, interferiría con el proceso político de formulación de política pública que ha de pautar el gobierno ante un déficit presupuestario. Arguye que le corresponde a la Rama Ejecutiva formular política pública sobre como asegurar y brindar los servicios de salud y seguridad pública, entre otros.

No hay duda que la formulación de política pública sobre los asuntos de salud y seguridad pública, entre otros, están delegadas por la Constitución de Puerto Rico en las ramas políticas del gobierno. No obstante, es claramente justiciable una controversia surgida a raíz de una alegación de que la Rama Ejecutiva traspasa los límites del principio de separación de poderes contenido en la Constitución de Puerto Rico, al intervenir los fondos asignados a la Oficina del Contralor por disposición legislativa para sufragar sus gastos, que están bajo la custodia y control del Secretario de Hacienda. La Rama Ejecutiva puede formular política pública sobre las áreas

_____

[46] United States v. Nixon, *supra*.

de salud, seguridad pública y atender un problema presupuestario, entre otros, realizando los ajustes, tomando las medidas necesarias y efectuando los desembolsos necesarios de los fondos asignados a esa rama de gobierno para sufragar los gastos presupuestados para la misma, cumpliendo con los límites que le impone la Constitución de Puerto Rico y la ley.

El Gobernador plantea, además, que la controversia ante nos no es justiciable porque no está madura. Coincidimos con el Contralor de que el principio de justiciabilidad es una moneda de dos caras compuesta por las doctrinas de academicidad y madurez. No es legítimo la utilización de principios de esa naturaleza como una táctica de litigación que impone a los litigantes una carrera de obstáculos cambiantes. Ya discutimos previamente el asunto sobre academicidad. ¿Es acreedor el Gobernador al carácter esencialmente prudencial que la doctrina de madurez pudiera justificar? La contestación es en la negativa. Veamos.

El Gobernador de Puerto Rico se rige en una situación como la presente por el Artículo VI, Secciones 6,7 y 8 de la Constitución de Puerto Rico, *supra,* y por la infraestructura jurídica estatutaria vigente que regula el escenario. Al terminarse el año fiscal 2004-2005, y no habiéndose aprobado por la Legislatura las asignaciones presupuestarias sugeridas por el Gobernador, continuó rigiendo para el año fiscal 2005-2006 el mismo estado de

derecho estatutario para los mismos fines y propósitos, en todo lo que le fuere aplicable, a todas las ramas del gobierno. El Gobernador está obligado por la Constitución de Puerto Rico y la ley a autorizar los desembolsos necesarios a todas las ramas del gobierno a tales fines. Los gastos de la Rama Ejecutiva no debían exceder los recursos económicos calculados para el año fiscal 2005-2006 para esa rama de gobierno, hasta que se aprobaran los recursos económicos correspondientes, de ser necesarios. De no ser suficientes los recursos económicos disponibles para el año fiscal 2005-2006 para cubrir los gastos presupuestados de la Rama Ejecutiva para ese año, el Gobernador tenía la obligación constitucional de pagar los intereses y amortizar la deuda pública y luego hacer los desembolsos de acuerdo con la norma de prioridades dispuesta por estatuto. Este último extremo está cubierto por el Artículo 4(c) la Ley de Gerencia y Presupuesto.[47]

El Artículo 4, incisos (c) y (d), de la Ley de Gerencia y Presupuesto, *supra*, dispone, además de las normas sobre prioridades ante un escenario de esa naturaleza, las medidas administrativas a tomarse por el Primer Ejecutivo(a). Es responsabilidad y obligación del Gobernador(a) tomar las medidas y realizar los ajustes necesarios, que estén a su alcance y de conformidad a la

---

[47] Ley Núm. 147 de 18 de junio de 1980, 23 L.P.R.A. secs. 101 et seq., según enmendada por la Ley Núm. 286 de 20 de diciembre de 2002.

ley, para lograr un presupuesto balanceado al final del año fiscal, y rendir a los Presidentes del Senado y de la Cámara de Representantes, así como a las Comisiones de Hacienda de ambos cuerpos, un informe detallado de los ajustes y medidas tomadas. En dicho informe, el Gobernador(a) debe someter sus recomendaciones a la Legislatura en cuanto a la forma de atender las obras y actividades cuya ejecución queda pospuesta, cancelándose las obligaciones correspondientes a esas obras pospuestas. Dichas obligaciones canceladas se llevarán a los libros del Secretario(a) de Hacienda contra los recursos económicos disponibles en años subsiguientes, mediante el correspondiente libramiento de asignaciones. El Contralor alega en su escrito, presentado el 5 de mayo de 2006, que el Gobernador, en vez de cumplir con su deber ministerial impuesto por el Artículo VI, Sección 7 de la Constitución de Puerto Rico, *supra,* y por la ley, de tratar y de esforzarse en no exceder los gastos de la Rama Ejecutiva sobre los recursos económicos del año fiscal 2005-2006, no sólo se excedió en los gastos presupuestados sobre los ingresos estimados para recaudarse por el Departamento de Hacienda sino que al 6 de abril de 2006, había incurrido en gastos adicionales no presupuestados en por lo menos 48 agencias de esa rama de gobierno. Ciertamente, el Gobernador no ha colocado a este Tribunal en posición de determinar que la controversia ante nos no está madura. No

ha acreditado, hasta el presente, su cumplimiento con ninguna de las circunstancias, a tenor con la Ley, para convertirse en acreedor al carácter prudencial de la doctrina de madurez. No ha expresado en forma alguna qué medidas o ajustes realizó para que la Rama Ejecutiva terminara su año fiscal 2005-2006 con un presupuesto balanceado y porqué no alcanzó tal objetivo. La Rama Judicial y la Legislativa y la Oficina del Contralor informaron tener un presupuesto balanceado para el mismo periodo, al tomar medidas de austeridad en cumplimiento de su deber ministerial impuesto por el Artículo VI, Sección 7 de la Constitución de Puerto Rico, *supra*.

**El Gobernador no ha colocado a este Tribunal en posición de determinar que de concederse el remedio solicitado intervendríamos en forma impermisible con su rol constitucional. Lo que está planteado en la controversia ante nos es si el Gobernador excedió las facultades que le otorga la Constitución de Puerto Rico, en un escenario como el presentado. ¿Tenía el Gobernador autoridad concedida por la Constitución de Puerto Rico o por la Legislatura para promulgar la OE-2006-10? ¿Tenía el Gobernador, como deber ministerial impuesto por la Constitución de Puerto Rico, la obligación de cumplir y hacer cumplir la ley, que reconoce y establece la autonomía administrativa, funcional y fiscal de la Oficina del Contralor? ¿Violó el Gobernador el principio de forma republicana de gobierno de la**

**Constitución de Puerto Rico al promulgar la OE- 2006-10? Definitivamente todos estos asuntos están sujetos a revisión judicial.**

**VI**

**CONTRALOR DE PUERTO RICO**

En Puerto Rico, el Contralor es un funcionario de rango constitucional. El Artículo III, Sección 22 de la Constitución de Puerto Rico creó la posición de Contralor de Puerto Rico.[48] Dispone que el Contralor fiscalizará todos los ingresos, cuentas y desembolsos del Estado, de sus agencias e instrumentalidades y de los municipios, para determinar si se han hecho de acuerdo a la ley. Rendirá informes anuales y todos aquellos informes especiales que le sean requeridos por la Asamblea Legislativa y el Gobernador.[49]

El referido mandato constitucional se implantó mediante la Ley Núm. 9 de 24 de julio de 1952, la cual creó la Oficina del Contralor, bajo la dirección del Contralor y la responsabilidad de la Asamblea Legislativa.[50]

La misión del Contralor consiste en realizar una intervención *a posteriori* (post audit) de las cuentas, ingresos y desembolsos del gobierno para determinar su legalidad. Sus facultades están constitucionalmente

---

[48] Const. E.L.A., *supra*, Art. III, Sec. 22, pág. 383.

[49] Íd.

[50] 2 L.P.R.A. sec. 71, et. seq.

circunscritas a investigar e informar sobre la legalidad del gasto de fondos públicos en que ha incurrido cualquier entidad del Estado o sus agentes.[51] El poder investigativo del Contralor se extiende sobre las entidades privadas que contratan obras o servicios con el Estado.[52]

La Oficina del Contralor disfruta de autonomía administrativa, funcional, y fiscal. El Artículo VI, Sección 11 de la Constitución de Puerto Rico dispone que el sueldo del Contralor se fijará por ley especial y no podrá ser disminuido durante el término para el cual fue nombrado.[53] El Artículo 3 (c) de la Ley de Contabilidad del Gobierno de Puerto Rico[54] establece que nada de lo dispuesto en dicho estatuto afectará la autonomía administrativa y fiscal de la Oficina del Contralor de Puerto Rico. Dicho artículo en su inciso (f) define como una **dependencia legislativa a la Oficina del Contralor** y prescribe que sus fondos deben estar, por ley, bajo la custodia y el control del Secretario de Hacienda.[55] El artículo 10 (e) del referido estatuto dispone que la contabilidad central de la

---

[51] RDT Const. Corp. v. Contralor I, 141 D.P.R. 424 (1996).

[52] Íd., H.M.C.A. (PR), Inc., etc. v. Contralor, 133 D.P.R. 945 (1993).

[53] Const. E.L.A., *supra,* Art. VI, Sec. 11, pág. 416.

[54] Ley Núm. 230 del 23 de julio de 1974, 3 L.P.R.A. sec. 283b(c), según enmendada por la Ley Núm. 140 de 11 de junio de 2004.

[55] Íd., sec. 283b(f).

propiedad pública de la Oficina del Contralor la llevará el Secretario de Hacienda, rigiéndose por la reglamentación que a tales efectos establezca el Contralor.

Las transacciones financieras de las **dependencias legislativas**, aunque se tramitarán por conducto del Secretario, no estarán sujetas **a la preintervención del Secretario en lo que se refiere a la exactitud, propiedad, corrección, necesidad y legalidad de las transacciones.** La única responsabilidad del Secretario es cerciorarse de que la asignación o fondos contra el cual se ordena un desembolso tenga saldo suficiente para cubrir el mismo y que el comprobante que origine el desembolso esté firmado por un funcionario de la **dependencia legislativa**, debidamente autorizado.[56]

## VII

## SEPARACIÓN TRIPARTITA DE PODERES

El Artículo I, Sección 2 de la Constitución de Puerto Rico[57] dispone lo siguiente:

> **Forma de gobierno**
>
> El gobierno del Estado Libre Asociado de Puerto Rico **tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución,** estarán igualmente subordinados a la

---

[56] Íd., sec. 283e(d).

[57] Const. E.L.A., *supra*, Art. I, sec. 2, pág. 256.

soberanía del pueblo de Puerto Rico. (Énfasis suplido).

El Artículo III, Sección 1 de la Constitución de Puerto Rico[58] dispone lo siguiente:

**Asamblea Legislativa**

El **Poder Legislativo** se ejercerá por una Asamblea Legislativa, que se compondrá de dos Cámaras-el Senado y la Cámara de Representantes-cuyos miembros serán elegidos por votación directa en cada elección general. (Énfasis suplido).

El Artículo IV, Sección 1 de la Constitución de Puerto Rico[59] dispone lo siguiente:

**Gobernador**

El **Poder Ejecutivo** se ejercerá por un Gobernador, quien será elegido por voto directo en cada elección general. (Énfasis suplido).

El Artículo V, Sección 1 de la Constitución de Puerto Rico[60] dispone lo siguiente:

**Poder judicial; Tribunal Supremo; otros tribunales**

El **Poder Judicial** de Puerto Rico se ejercerá por un Tribunal Supremo, y por aquellos otros tribunales que se establezcan por ley. (Énfasis suplido).

La limitación del poder político constituye un principio desarrollado por la teoría política liberal. Su instrumento fundamental es la distribución del poder. **La**

---

[58] Const. E.L.A., *supra,* Art. III, Sec. 1, pág. 365.

[59] Const. E.L.A., *supra*, Art. IV, Sec. 1, pág. 384.

[60] Const. E.L.A., *supra*, Art. V, Sec. 1, pág. 393.

**libertad es el resultado de la efectiva limitación del poder gubernamental sobre el individuo mediante un sistema donde "el poder frene al poder". Por ello, es necesario distribuir el poder entre diversos organismos de gobierno que se sirven mutuamente de contrapesos evitando de esa forma la concentración de poder gubernamental que pueda poner en peligro precisamente la libertad individual.[61] La organización interna de nuestro gobierno mediante la aprobación de nuestra Constitución está estructurada sobre una división tripartita de los poderes gubernamentales, cuyo fin principal es, en síntesis, asegurar la libertad del individuo contra la opresión del gobierno. El principio de la separación de poderes se adoptó por nuestra Asamblea Constituyente con el fin de impedir que se ejercitara un poder arbitrario.** No creemos que tuvo el propósito de evitar las fricciones, **pero sí salvar al pueblo de la autocracia**, disponiendo la forma de resolver las controversias emergentes de la fricción inevitable e incidental a la distribución de los poderes gubernamentales entre las tres ramas de gobierno.

Las facultades delegadas por el pueblo al Gobierno, en virtud del principio de separación de poderes contenido en la Constitución de Puerto Rico, se distribuyen entre las tres (3) ramas: la Judicial, la Ejecutiva y la Legislativa. Con este principio se persigue evitar la concentración de

---

[61] R. Serrano Geyls, op. cit., pág. 571.

poderes en una sola rama de gobierno, o el abuso de poder por parte de una de ellas; establecer un sistema de pesos y contra pesos que mantenga el equilibrio en el manejo del poder y asegurar una eficiente interacción entre las tres ramas gubernamentales.[62] El principio aludido no implica que las diferentes ramas del Gobierno deban mantenerse absolutamente separadas en todo momento ni que funcionen en "el vacío independientemente de las otras".[63] Puede existir un grado de interrelación entre ellas, siempre y cuando se mantenga íntegra la autoridad de cada una de ellas. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Para ello, la relación entre los poderes del Gobierno debe ser dinámica y armoniosa.[64] **Para decidir si una actuación de la Rama Ejecutiva viola el principio de la separación de poderes, debe determinarse si la limitación de facultades que pretende, concentra indebidamente el poder**

---

[62] Sánchez et. al. v. Srio. de Justicia et. al., 2002 T.S.P.R. 98, 2002 J.T.S. 105, 157 D.P.R.____(2002); Pueblo v. Santiago Feliciano, 139 D.P.R. 361 (1995); Noriega v. Hernández Colón, 135 D.P.R. 406 (1994); P.I.P. v. C.E.E., 120 D.P.R. 580, 611 (1988); Silva v. Hernández Agosto, *supra*.

[63] Pueblo v. Santiago Feliciano, *supra*; Noriega v. Hernández Colón, *supra*.

[64] Pueblo v. Santiago Feliciano, *supra*, pág.420; Silva v. Hernández Agosto, *supra*, pág. 47.

gubernamental en esa rama o si disminuye la independencia de alguna de ellas en el fiel desempeño de sus funciones.[65]

**PODERES DEL GOBERNADOR(A) DE PUERTO RICO**

El Artículo IV, Sección 4 de la Constitución de Puerto Rico,[66] dispone lo siguiente:

> **Facultades y deberes del Gobernador**
>
> Los **deberes, funciones y atribuciones** del Gobernador serán:
>
> **Cumplir y hacer cumplir las leyes.**
>
> ...
>
> **Ejercer las otras facultades y atribuciones y cumplir los demás deberes que se le señalen por esta Constitución o por ley.** (Énfasis suplido).

El Gobernador de Puerto Rico tiene la facultad para ejercer la dirección general de la administración pública con el claro entendimiento de que comprende la **"supervisión e inspección"** de los departamentos y agencias de gobierno de la Rama Ejecutiva así como **de las corporaciones públicas y de ciertas entidades autónomas creadas por ley.**[67]

---

[65] Pueblo v. Santiago Feliciano, *supra*.

[66] Const. E.L.A., *supra*, Art. IV, Sec. 4, pág. 385.

[67] Tomo 4, Diario de Sesiones de la Convención Constituyente de Puerto Rico (Edición Conmemorativa), pág. 2606 (2003).

Una Orden Ejecutiva encuentra apoyo legal en la facultad general del Primer Ejecutivo(a) **de cumplir y hacer cumplir las leyes, vigilar y supervisar la conducta oficial de todos los funcionarios de la Rama Ejecutiva y de cuidar que cumplan con los deberes y las obligaciones de sus cargos a tenor con la ley. Toda Orden Ejecutiva enmarca un mandato dirigido a los organismos gubernamentales de la Rama Ejecutiva, a tenor con la Constitución de Puerto Rico y el ordenamiento jurídico estatutario. No obstante, la facultad del Gobernador(a) para emitir Órdenes Ejecutivas no puede ejercerse o tener un efecto contrario a lo dispuesto por ley. Las Órdenes Ejecutivas, promulgadas a tenor con la autoridad concedida al Gobernador(a), bien sea por la Constitución de Puerto Rico o por la Legislatura, tienen efecto de ley. Por el contrario no tienen efecto de ley las Órdenes Ejecutivas promulgadas por el Gobernador(a) en ausencia de autorización concedida por la Constitución de Puerto Rico o por estatuto.[68]**

En la delimitación de los organismos gubernamentales de la Rama Ejecutiva, a los cuales va dirigida una Orden Ejecutiva, no debe acudirse a ésta última como primer recurso cuando se quiera recabar la cooperación de criaturas jurídicas creadas por ley como las corporaciones públicas. Las corporaciones públicas generalmente ejercen sus poderes por conducto de una Junta de Directores, que es

---

[68] Op. Sec. Just. Núm. 1985-5.

el organismo autorizado a decidir la acción a seguir en determinado asunto. Una Orden Ejecutiva promulgada por el Gobernador(a) y dirigida a una corporación pública que **la ley ha dispuesto su independencia y separación del resto de la Rama Ejecutiva claramente conflije con la autonomía operacional y funcional con la que el estatuto que la creó le invistió para lograr sus fines.**[69]

El Gobernador(a) tiene la facultad y a la misma vez el deber y obligación, a tenor con el Artículo IV, Sección 4 de la Constitución de Puerto Rico, *supra*, de cumplir y poner en vigor las leyes vigentes y de hacer cumplir y poner en vigor las mismas a través de todos aquellos funcionarios que están bajo su poder de "supervisión e inspección". Para el descargo de ese rol de naturaleza constitucional, el Gobernador(a) tiene poder absoluto e irrestricto sobre ciertos y determinados "funcionarios ejecutivos" cuyas funciones son "puramente ejecutivas" y están directamente vinculadas con el descargo de su rol constitucional. De no tener facultades plenarias sobre esos funcionarios no podría formular la política pública de la Rama Ejecutiva, a tenor con el mandato democrático del Pueblo. Tales funcionarios son esencial y fundamentalmente los miembros del Gabinete del Gobernador(a) y su cuerpo de asesores y ayudantes. A través de esos funcionarios se formula y se implanta la política pública de la Rama

---

[69] Íd., págs. 31-32.

Ejecutiva, y se inicia, cuando es necesario, la aprobación, mediante proyectos de ley de administración, de estatutos ajustados a su programa de gobierno. Una vez aprobada, y ya vigente esa legislación, los miembros del Gabinete fundamentalmente están llamados a cumplirla y ponerla en vigor en representación del Gobernador(a). No obstante, de mantenerse vigentes ciertos y determinados estatutos por no ser derogados o enmendados por la Legislatura, el Gobernador(a) tiene la facultad y, a la misma vez, el deber y obligación de cumplir con ellos y ponerlos en vigor, de hacerlos cumplir y que se pongan en vigor a través de los funcionarios que están bajo su "supervisión e inspección". Existen funcionarios que, aunque están adscritos a la Rama Ejecutiva y bajo el poder de "supervisión e inspección" del Gobernador(a), las funciones que ejercitan no son esenciales y fundamentales para que éste(a) último(a) pueda rendir su rol constitucional. Sobre esos funcionarios el poder del Gobernador(a) no es absoluto y puede ser restringido y limitado por la Asamblea Legislativa de Puerto Rico, sin menoscabar el poder de "supervisión e inspección" de naturaleza constitucional que el Primer Ejecutivo(a) tiene sobre ellos. Existen algunas situaciones donde el Poder Legislativo puede utilizar tal mecanismo para concederle a ciertos y determinados funcionarios adscritos a la Rama Ejecutiva con la independencia y autonomía que es necesaria para que puedan

descargar ciertas funciones sin interferencia y por ende, en esos casos, de una forma más efectiva y eficiente.  Ese es el caso, por ejemplo, de algunos funcionarios que aunque están adscritos a la Rama Ejecutiva  y bajo el poder de "supervisión e inspección" del Gobernador(a) descargan funciones que necesariamente tienen que ejercitarse en forma independiente. Sobre estos organismos que disfrutan de autonomía administrativa y funcional, el estatuto que los crea puede impedir válidamente que el Gobernador(a) intervenga con sus fondos, asignados para sufragar sus gastos presupuestados, por  disposición legislativa.

Como mencionáramos previamente, la función de ser intérprete final de la Constitución de Puerto Rico le corresponde exclusivamente al Poder Judicial.  La Constitución les confiere determinadas facultades al Poder Legislativo y al Ejecutivo, pero la definición de sus contornos y la determinación de la validez de su ejercicio son asuntos cuidadosamente asignados a los tribunales.[70]  Es función ineludible de los tribunales interpretar la Constitución y velar porque no se vulnere su espíritu y esquema democrático.  Cuando haya conflicto sobre el alcance de los poderes constitucionales de una rama de gobierno, los tribunales deben intervenir, con prudencia y

---

[70] Santa Aponte v. Srio. del Senado, 105 D.P.R. 750, 759 (1977); Band v. Floyd, 385 U.S. 110, 131 (1966).

deferencia, para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias.[71]

El presente caso obliga a impartirle vivencia a las disposiciones constitucionales y estatutarias que regulan la presente situación. **La interrogante principal sobre la cual se centra la controversia es la siguiente: ¿tiene el Gobernador de Puerto Rico autoridad constitucional o estatutaria, activado el Artículo VI, Sección 6 de la Constitución de Puerto Rico, *supra*, para reducir unilateralmente los fondos disponibles, asignados por ley, para sufragar los gastos de la Oficina del Contralor de Puerto Rico? La contestación a esa interrogante es en la negativa.**

El 30 de junio de 2005, quedó aprobada por la Rama Legislativa la Resolución Conjunta de la Cámara de Representantes Núm. 445 sobre el presupuesto del año fiscal 2005-2006. La misma fue remitida al Gobernador, quien le impartió un veto de bolsillo. Tal acción activó el Artículo VI, Sección 6 de la Constitución de Puerto Rico, *supra*, y continuó vigente automáticamente para el año fiscal 2005-2006 la Resolución Conjunta de la Cámara de Representantes Núm. 927, aprobada por la Rama Legislativa el 30 de junio de 2004 para el año fiscal 2004-2005, que

---

[71] Silva v. Hernández Agosto, *supra*, pág. 57; Vélez Ramírez v. Romero Barceló, 112 D.P.R. 716, 731-734 (1982); Santa Aponte v. Srio. del Senado, *supra*; García Passalacqua v. Tribunal Electoral, 105 D.P.R. 49 (1976); Fuster v. Busó, 102 D.P.R. 327 (1974).

contiene las partidas de gastos del gobierno para ese periodo. También quedaron vigentes para el año fiscal 2005-2006 otras medidas legislativas aprobadas para tener vigencia durante el año fiscal 2004-2005, que dispusieron sobre otras partidas para gastos de funcionamiento del gobierno.

El Gobernador tenía a su alcance impartirle un veto de partida a la Resolución Conjunta de la Cámara de Representantes Núm. 445 sobre el presupuesto del año fiscal 2005-2006. Dicha facultad del Gobernador comprendía la de eliminar una o más partidas o disminuir aquellas incluidas en dicha medida legislativa.[72] Tal acción hubiera producido el efecto de reducir los gastos proyectados para el año fiscal 2005-2006, antes de que la medida alcanzara fuerza de ley. No obstante, no lo hizo. Le impartió un veto de bolsillo a toda la medida, renunciando a esa facultad y activándose, de esa forma, el Artículo 6, Sección 6, *supra*, de la Constitución de Puerto Rico, continuando vigente el presupuesto dispuesto por ley para el año anterior. En el Diario de Sesiones de la Asamblea Constituyente quedó diáfanamente claro que la Asamblea Legislativa no tendría poder para revocar la utilización del veto de partidas por el Gobernador.[73] No obstante, de no utilizarse tal facultad

---

[72] Const. E.L.A., *supra*, Art. III, Sec. 20, pág. 382.

[73] J. Trias Monge, <u>Historia Constitucional de Puerto Rico</u>, Primera Edición, Rio Piedras, Ed. U.P.R., 1982, Vol. III, págs. 162-163.

por el Gobernador y optando éste por impartirle fuerza de ley con su firma, o rechazándola con un veto de bolsillo, como lo hizo, le imprimió continuación a la medida legislativa que estaba vigente con relación al presupuesto del año fiscal 2004-2005. El Gobernador no tiene la facultad para enmendar una ley vigente mediante una Orden Ejecutiva. Por el contrario, tiene el deber y obligación de cumplirla y hacerla cumplir.

La facultad constitucional del Gobernador de utilizar el veto de partidas es una que le imprime un poder a ese funcionario, como medida de balance y equilibrio, durante el proceso de aprobación del presupuesto para el próximo año fiscal y antes de que alcance fuerza de ley con el propósito de cumplir su obligación y deber constitucional de mantener un presupuesto balanceado. Una vez la medida alcanza fuerza de ley, el Gobernador queda sujeto y limitado por el principio constitucional de separación de poderes a tomar las medidas administrativas sobre la Rama Ejecutiva que dispone la Constitución de Puerto Rico y la ley. De otra forma, el principio de gobierno republicano que contempla nuestro magno documento sería inoperante en un escenario como el presente. Se acumularía todo el poder del gobierno, en su función operacional, en el primer ejecutivo.

Una vez se convierte en ley una medida sobre presupuesto, las partidas formuladas para la oficina del

Contralor de Puerto Rico, dependencia adscrita a la Rama Legislativa, queda protegida, para su función constitucional, por el principio, de igual rango, de la separación de los tres (3) poderes de gobierno. Esto es así para asegurar el funcionamiento efectivo y eficiente de nuestro sistema constitucional de gobierno republicano y democrático.

La Rama Ejecutiva estimó a principios del año fiscal 2005-2006, que las asignaciones totales de gastos ordinarios de funcionamiento del gobierno vigentes para ese periodo ascendieron a nueve mil doscientos ochenta y cuatro millones de dólares $9,284,000,000. El Secretario **estimó** que los recursos económicos totales a recaudarse para ese periodo ascenderían a ocho mil novecientos cuarenta y cinco millones de dólares ($8,945,000,000).[74] A tenor con tal escenario, la Rama Ejecutiva concluyó que el presupuesto de gastos del gobierno para el año fiscal 2005-2006 habría de ser uno deficitario.

Presente el anterior escenario, y a tenor con el Artículo VI, Sección 7 de la Constitución de Puerto Rico, *supra*, que prohíbe que las asignaciones y gastos del gobierno para un año fiscal excedan los recursos económicos totales calculados para ese mismo periodo, el Gobernador invocó el Artículo VI, sección 6 del magno documento,

---

[74] El Secretario de Hacienda formuló tal cifra como un estimado, no como un dato concreto.

*supra*, para emitir la Orden Ejecutiva 2006-10.  Por virtud de la misma autorizó los desembolsos a realizarse por el Departamento de Hacienda a las tres ramas del gobierno y a la Oficina del Contralor de Puerto Rico, entre otros.  El Artículo VI Sección 6, *supra*, lee de la forma siguiente:

> Cuando a la terminación de un año económico no se hubieren aprobado las asignaciones necesarias para los gastos ordinarios de funcionamiento del gobierno y para el pago de intereses y amortización de la deuda pública durante el siguiente año económico, **continuarán rigiendo las partidas consignadas en las últimas leyes aprobadas para los mismos fines y propósitos en todo lo que fueren aplicables, y el Gobernador autorizará los desembolsos necesarios a tales fines hasta que se aprueben las asignaciones correspondientes** [Énfasis Suplido].

En el POR TANTO tercero de la OE-2006-10, el Gobernador instruyó al Secretario de Hacienda a proceder con los desembolsos a la Oficina del Contralor por concepto de nómina, reduciendo a un setenta y cinco por ciento (75%) los desembolsos dispuestos para esa dependencia, por tal concepto, para los meses de mayo y junio del año fiscal 2005-2006, a pesar de que el Contralor anunció que su dependencia habría de concluir dicho periodo con un presupuesto balanceado, como consecuencia de las medidas y ajustes realizados, ante el escenario de que todas las dependencias del gobierno habrían de contar con menos recursos económicos que el gasto presupuestado.

El Contralor(a) de Puerto Rico no es un funcionario

que se encuentra bajo el poder de "supervisión e inspección" del Gobernador(a). No surge del Artículo VI, Secciones 6, 7 y 8 de la Constitución de Puerto Rico, *supra*, ni del Artículo 4(c) de la Ley de Gerencia y Presupuesto, *supra*, autoridad alguna del Gobernador para ajustar o tomar medidas respecto a los desembolsos proyectados a la Oficina del Contralor, que se encuentra bajo la responsabilidad de la Asamblea Legislativa y es una entidad que disfruta de autonomía administrativa, funcional y fiscal. El Artículo VI, Sección 8 del magno documento, *supra,* y el referido estatuto formulan la norma sobre prioridades y las medidas administrativas que podrá tomar el Gobernador sobre la Rama Ejecutiva ante un cuadro de escasez de fondos públicos para sufragar el gasto presupuestado. Tal autoridad no se extiende a la Oficina del Contralor.

El Gobernador(a) tiene la facultad para ejercer la dirección general de la administración pública y de "supervisar e inspeccionar" los departamentos y agencias del gobierno de la Rama Ejecutiva así como de las corporaciones públicas y de las entidades autónomas creadas por ley que están adscritas a la Rama Ejecutiva, y bajo ese poder del Gobernador(a). El Gobernador(a) no tiene autoridad alguna sobre una entidad autónoma creada por la Constitución de Puerto Rico que no está adscrita a la Rama Ejecutiva sino a la Rama Legislativa. El Secretario de

Hacienda tiene la custodia y el control de los fondos del Gobierno para sufragar los gastos presupuestados. El Gobernador y su Secretario de Hacienda están obligados por virtud del principio de separación de poderes de la Constitución de Puerto Rico y de los estatutos ya mencionados, a ordenar y a verificar los desembolsos autorizados por disposición legislativa para la Rama Legislativa y Judicial, y ~~por~~ las entidades autónomas, para sufragar sus gastos. El Gobernador no tiene autoridad constitucional ni estatutaria para realizar reducciones unilateralmente a los desembolsos proyectados por el Contralor para su oficina, por concepto de nómina. La falta de consenso en el proceso político celebrándose en las Cámaras Legislativas para afrontar la alegada crisis fiscal de Puerto Rico, no puede justificar que el Gobernador se abrogue un poder cuyo ejercicio es claramente inconstitucional y cuyo único propósito es adjudicarle una ventaja indebida e impropia frente al Poder Legislativo en dicho proceso.[75]

---

[75] El Artículo 267 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4895, tipifica como delito las conductas siguientes:

**Malversación de fondos públicos**

**Incurrirá en delito grave de tercer grado, independientemente de si obtuvo o no beneficio para sí o para un tercero todo funcionario o empleado público que sea directa o indirectamente responsable de la** administración, traspaso, cuidado, **custodia, ingresos, desembolsos o contabilidad de fondos públicos que:**

El permitir tal proceder de parte del Gobernador disloca el fino balance de nuestra forma republicana de gobierno. La actuación del Gobernador violó el principio de la separación de poderes. Limitó las facultades de la Oficina del Contralor concentrando de una forma indebida e impropia el control de todo el poder gubernamental en la Rama Ejecutiva. Tal actuación constituye una crasa violación y grave laceración a nuestro sistema republicano de gobierno. Bajo el pretexto de atender la alegada crisis presupuestaria, el Gobernador intervino con el funcionamiento de la Oficina del Contralor, llamada a fiscalizar los gastos de la Rama Ejecutiva. Estamos en la obligación de salvar al pueblo de la autocracia ante el ejercicio de un poder arbitrario de tal magnitud de parte del Gobernador.

---

(a) se los apropie ilegalmente, en todo o en parte;

**(b) los utilice para cualquier fin que no esté autorizado o que sea contrario a la ley o a la reglamentación;**

(c) los deposite ilegalmente o altere o realice cualquier asiento o registro en alguna cuenta o documento relacionado con ellos sin autorización o contrario a la ley o a la reglamentación;

**(d) los retenga,** convierta, **traspase o entregue ilegalmente, sin autorización o contrario a la ley o a la reglamentación; o**

**(e) deje de** guarde o **desembolsar fondos públicos en la forma prescrita por ley.**

**Cuando el autor sea un funcionario público o la pérdida de fondos públicos sobrepase de cincuenta mil (50,000) dólares, incurrirá en delito grave de segundo grado.**

El tribunal podrá también imponer la pena de restitución. (Énfasis suplido)

El Gobernador, como mencionáramos previamente, tiene un deber ministerial de cumplir y hacer cumplir las leyes. Dicho funcionario tiene, además, como deber ministerial impuesto por ley el respetar el principio e constitucional de separación de poderes y la autonomía administrativa, funcional y fiscal de la Oficina del Contralor. Está impedido de intervenir los recursos económicos asignados por estatuto a la Oficina del Contralor, que es una dependencia legislativa autónoma, de origen constitucional. Cualquier ejercicio de esa dependencia para balancear su presupuesto ante una situación de déficit le corresponde al Contralor. La OE-2006-10 fue promulgada por el Gobernador, en ausencia de autorización concedida a ese funcionario por el Artículo VI, Sección 6 de la Constitución de Puerto Rico, *supra,* con el propósito de intervenir con los fondos del Contralor, los cuales se encuentran bajo la custodia y control del Secretario de Hacienda. Tal actuación constituye un incumplimiento con sus deberes ministeriales impuestos por la Constitución de Puerto Rico y por estatuto. Tal orden ejecutiva no tiene efecto de ley alguno.

## VIII

Estamos obligados a actuar frente al cuadro que tenemos presente para proteger y garantizar nuestra forma republicana de gobierno. Debemos intervenir con la

actuación indebida e impropia del Gobernador sobre la autonomía funcional, administrativa y fiscal de la Oficina del Contralor. Nuestra intervención resulta imprescindible ante la crisis constitucional mas sería y grave de nuestra historia. Es nuestro deber y obligación proteger y preservar el interés público inmanente del esquema democrático de la Constitución de Puerto Rico.

Por los fundamentos antes expuestos disentimos de lo actuado por la Mayoría y expediríamos el auto de Mandamus solicitado.

Efraín E. Rivera Pérez

Juez Asociado